IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
IN RE: AMERICAN INVESTORS       :
LIFE INSURANCE CO. ANNUITY      :    MDL DOCKET NO. 1712
MARKETING AND SALES PRACTICES   :
LITIGATION                      :
                                :
Relates to:                     :
                                :
GILMOUR v. BOHMUELLER, et al.   :
CIVIL ACTION NO. 04-2535        :
                                :
TRIMBLE v. WEINSTEIN, et al.    :
CIVIL ACTION NO. 05-2101        :
                                :
BRENNAN v. WEINSTEIN, et al.    :
CIVIL ACTION NO. 05-3588 _____  :
```

<u>MEMORANDUM AND ORDER</u>

TABLE OF CONTENTS

I.   Factual Background . . . . . . . . . . . . . . . . . . . 2

   A.   The Scheme. . . . . . . . . . . . . . . . . . . . . 3

   B.   The Defendants. . . . . . . . . . . . . . . . . . . 7

      1.   The Insurance Company Group. . . . . . . . . . 8

      2.   The Sales Group. . . . . . . . . . . . . . . . 9

      3.   The Attorney Group.. . . . . . . . . . . . . . 10

   C.   The Plaintiffs and Their Individual Allegations.. . 10

      1.   Richard and Dena Stein.. . . . . . . . . . . . 10

      2.   Mary Lynch.. . . . . . . . . . . . . . . . . . 12

      3.   Beryl and Charlotte Price. . . . . . . . . . . 14

      4.   John Healy.. . . . . . . . . . . . . . . . . . 15

      5.   Jean Ryles.. . . . . . . . . . . . . . . . . . 16

      6.   George Miller. . . . . . . . . . . . . . . . . 17

      7.   Edward and Gloria Inferrera. . . . . . . . . . 18

      8.   Evelyn Edwards.. . . . . . . . . . . . . . . . 19

      9.   Jonathan Upchurch/Edith Newcomer.. . . . . . . 20

     10.  Walter and Suzanne Gilmour.. . . . . . . . . . 21

     11.  Harcourt Trimble, III/Harcourt and Barbara
        Trimble. . . . . . . . . . . . . . . . . . . . 22

     12.  Margie Brennan Treitz/Gilbert and Joanne
        Brennan. . . . . . . . . . . . . . . . . . . . 24

i

II.   Procedural History and Overview of the Claims. . . . . .   28

III. Analysis.. . . . . . . . . . . . . . . . . . . . . . . .   33

        A.   Defendants Dismissed for Failure to State Any Claim
             . . . . . . . . . . . . . . . . . . . . . . .   34

        B.   RICO. . . . . . . . . . . . . . . . . . . . . .   35

             1.   Claim Under Subsection 1962(c).. . . . . . .   35

                  a.   Existence of an Enterprise. . . . . . .   36

                       (1)  The Existence of an Ongoing
                            Organization.. . . . . . . . . . .   37

                       (2)  The Various Associates Functioned
                            as a Continuing Unit.. . . . . . .   41

                       (3)  Existence Separate and Apart from
                            Alleged Racketeering Activity. . . .   43

                  b.   Conduct or Participation. . . . . . . .   45

                  c.   Racketeering Activity.. . . . . . . . .   49

                       (1)  Scheme to Defraud. . . . . . . . .   51

                       (2)  Use of the Mails or Wires. . . . .   55

                            (a)  The Insurance Company Group
                                 Defendants. . . . . . . . . .   57

                            (b)  Bohmueller. . . . . . . . . .   59

                            (c)  Weinstein and Plaza.. . . . .   61

                            (d)  The Patriot Group.. . . . . .   62

                       (3)  Injury to Business or Property.. . .   63

             2.   Claim Under Subsection 1962(d).. . . . . . .   67

             3.   Whether the McCarron-Ferguson Act Bars the
                  Plaintiffs' RICO Claims. . . . . . . . . . .   68

        C.   State Law Claims. . . . . . . . . . . . . . . .   69

1.   Statute of Limitations.. . . . . . . . . . .  70

2.   Breach of Fiduciary Duty.. . . . . . . . . .  73

3.   Negligent Supervision. . . . . . . . . . . .  75

4.   Unjust Enrichment. . . . . . . . . . . . . .  76

5.   Fraudulent Misrepresentation and Negligent
     Misrepresentation. . . . . . . . . . . . . .  79

6.   Civil Conspiracy.. . . . . . . . . . . . . .  81

7.   Professional Negligence. . . . . . . . . . .  81

8.   Breach of Contract.. . . . . . . . . . . . .  84

9.   Violation of the Pennsylvania Unfair Trade
     Practices and Consumer Protection Law. . . . .  86

10.  Negligence Per Se. . . . . . . . . . . . . .  87

11.  An Accounting. . . . . . . . . . . . . . . .  88

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: AMERICAN INVESTORS     :   MDL DOCKET NO. 1712
LIFE INSURANCE CO. ANNUITY    :
MARKETING AND SALES PRACTICES  :
LITIGATION                    :
                              :
Relates to:                   :
                              :
GILMOUR v. BOHMUELLER, et al. :
CIVIL ACTION NO. 04-2535      :
                              :
TRIMBLE v. WEINSTEIN, et al.  :
CIVIL ACTION NO. 05-2101      :
                              :
BRENNAN v. WEINSTEIN, et al.  :
CIVIL ACTION NO. 05-3588 _____:


MEMORANDUM AND ORDER


McLaughlin, J.                                 August 29, 2007

        In this multidistrict litigation, the plaintiffs have

sued several defendants for damages arising from an allegedly

fraudulent scheme to sell senior citizens unnecessary and

unsuitable estate planning instruments and annuities.  According

to the plaintiffs, the defendants participated in this scheme

through their involvement in one of three groups: the "Insurance

Company Group," the "Sales Group," or the "Attorney Group."  The

plaintiffs seek damages and injunctive relief under the Racketeer

Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §

1961 et seq., as well as under various state law causes of

action.

The defendants in the <u>Stein</u> consolidated class action, as well as certain defendants in the <u>Gilmour</u>, <u>Trimble</u>, and <u>Treitz</u> individual actions, have filed motions to dismiss.  Also pending in the <u>Trimble</u> individual action is a motion for judgment on the pleadings.[1]  These motions all seek dismissal on the ground that the plaintiffs have failed to state a claim.

The Court will grant the motions to dismiss insofar as they seek dismissal of all claims against defendants Chiavaroli, Ms. Strope, Newmark, and AMH.  The Court will also grant the motions to the extent that they seek dismissal of the RICO claims alleged by the Inferreras, Ryles, Miller, and Edwards.  To the extent that the motions seek dismissal of the RICO claims alleged by all other plaintiffs, the Court will deny the motions.  With regard to the state clams, the Court will grant the motions in part and deny them in part.

I.   <u>Factual Background</u>

The defendants consist of a group of insurance companies (the "Insurance Company Group"), a group of salespeople (the "Sales Group"), and a group of attorneys (the "Attorney Group").  According to the plaintiffs, these three groups worked together to execute an allegedly fraudulent scheme whose goal was

---

[1]   The full citations for the four lawsuits that are subject to the instant motions are as follows:  <u>Stein v. AmerUs Group Co.</u>, No. 05-1712; <u>Gilmour v. Bohmueller</u>, No. 04-2535; <u>Trimble v. Weinstein</u>, No. 05-2101; and <u>Treitz v. Weinstein</u>, No. 05-3588.

2

to sell senior citizens unnecessary and unsuitable estate
planning instruments and annuities.  (<u>Stein</u> ¶¶ 1-8; <u>Gilmour</u> ¶ 1;
<u>Trimble</u> ¶ 2; <u>Treitz</u> ¶ 2).

A.   <u>The Scheme</u>

According to the plaintiffs, the Insurance Company
Group was the architect of the allegedly fraudulent scheme.  It
was this group of defendants that originally developed and
underwrote the annuities at issue in this litigation.  These
annuities, the plaintiffs allege, possessed certain
characteristics, such as lengthy deferral periods (<u>i.e.,</u> receipt
of monthly payments would be deferred) and large surrender
charges (<u>i.e.,</u> early-withdrawal penalties), that rendered them
unsuitable investments for senior citizens.  It was this very
class of individuals, however, that the Insurance Company Group
targeted for sale of its product.  (<u>Stein</u> ¶¶ 11-13; <u>Gilmour</u> ¶¶
173-81; <u>Trimble</u> ¶¶ 146-54; <u>Treitz</u> ¶¶ 169-77).

The Insurance Company Group induced these individuals
to buy its annuities by devising an allegedly fraudulent sales
scheme, which it then disseminated to members of both the Sales
Group and the Attorney Group via standardized marketing materials
and sales presentations.  Under this scheme, the Insurance
Company Group provided Sales Group members with "leads" that
consisted of individuals who were 65 years or older and who had
an estimated income bracket of $35,000 or more.  Through the

3

standardized marketing materials and sales presentations, the
Insurance Company Group taught the Sales Group members how to
first gain the trust of these potential annuity purchasers and
then how to take advantage of that trust by selling them
unnecessary and unsuitable estate planning instruments and
annuities.  (Stein ¶¶ 14-22, 223; Gilmour ¶¶ 174-77; Trimble ¶¶
147-50; Treitz ¶¶ 170-73).

      As set forth in the Insurance Company Group's marketing
materials and sales presentations, members of the Sales Group
would gain the trust of senior citizens by conferring upon
themselves imaginary titles, such as "Certified Elder Adviser" or
"Certified Senior Adviser."  In addition, the materials
instructed the Sales Group members to establish relationships
with attorneys who were willing to allow the salespeople to
identify themselves as lawyers or agents of lawyers.  Such self-
identification, the plaintiffs allege, induced potential annuity
purchasers to trust members of the Sales Group as though they
were objective advisers, rather than individuals with financial
incentives to sell annuities.  (Stein ¶¶ 14-23; Gilmour ¶¶ 194-
99; Trimble ¶¶ 167-73; Treitz ¶¶ 190-96).

      Having thus cloaked their true intentions, members of
the Sales Group were then instructed to conduct seminars (or
other such seemingly informational presentations) at which the
salespeople would offer ostensibly disinterested financial

4

advice.  At these presentations, the Sales Group members were instructed to hold themselves out as disinterested financial planners whose only affiliation was with an attorney.  Instead of offering disinterested advice, however, members of the Sales Group used these seminars and presentations, which were developed by the Insurance Company Group, solely as a way of convincing senior citizens to purchase the Insurance Company Group's annuities.  (Stein ¶¶ 250-57; Gilmour ¶¶ 194-200; Trimble ¶¶ 167-73; Treitz ¶¶ 190-96).

When conducting these presentations, members of the Sales Group were instructed to encourage attendees to set up living trusts through the attorneys with whom the Sales Group members had previously established relationships -- the Attorney Group.  Such living trusts would, members of the Sales Group assured attendees, help minimize taxes, as well as avoid certain pitfalls associated with wills and probate.  The process of creating these living trusts, however, was simply a convenient way of further cloaking the salesperson's true intentions, as well as identifying assets that could be used to purchase annuities.  (Stein ¶¶ 251-58; Gilmour ¶¶ 196-202; Trimble ¶¶ 171-77; Treitz ¶¶ 194-200).

The process of creating a living trust helped the Sales Group members accomplish these goals because it entails taking an inventory of all the living-trust purchaser's assets.  Only by

5

placing all assets within the trust could the living-trust purchaser possibly achieve the tax-minimization and probate-avoidance goals that were touted as the benefits of the product. The Sales Group members could thus further identify themselves as lawyers or associates of lawyers by taking this inventory, as well as identify which assets could be used to purchase the Insurance Company Group's annuities.  (<u>Stein</u> ¶¶ 251-58; <u>Gilmour</u> ¶¶ 196-202; <u>Trimble</u> ¶¶ 171-77; <u>Treitz</u> ¶¶ 194-200).

     At the conclusion of these presentations, Sales Group members would schedule follow-up visits with the attendees.  At these follow-up visits, the Sales Group members would again urge the potential annuity purchasers to set up living trusts so that the salespeople could use the inventory process as a "door-opener" for selling the Insurance Company Group's annuities. Alternatively, if the individual had already purchased such an instrument, the Sales Group members would immediately take an inventory of the potential purchaser's assets, ostensibly so that the living trust could achieve its goals.  Upon taking the inventory, the Sales Group members would recommend that the potential purchaser use any available assets to purchase one or more of the Insurance Company Group's annuities.  The Sales Group members would bolster this recommendation by representing that the annuity was a "suitable" investment.  If the individual agreed to buy an annuity, the Sales Group member would sell him

the product, thereby earning a hefty commission.  (<u>Stein</u> ¶¶ 254-58; <u>Gilmour</u> ¶¶ 199-203; <u>Trimble</u> ¶¶ 172-76; <u>Treitz</u> ¶¶ 195-99).

In the course of selling the living trusts and annuities, the Sales Group members were instructed to make several alleged material misrepresentations and omissions to potential purchasers, including (i) the alleged misrepresentation that the salespeople were neutral financial advisers when they were not, (ii) the alleged misrepresentation that a living trust would help the purchaser reduce taxes and avoid probate when it did not, (iii) the alleged misrepresentation that the annuities were "suitable" investments for the purchasers, and (iv) the alleged material omission that the long-term deferred annuities contained lengthy deferral periods, large surrender charges, and substantial early-withdrawal penalties on death benefits.  (<u>Stein</u> ¶¶ 14, 254, 259; <u>Gilmour</u> ¶¶ 1, 2, 43; <u>Trimble</u> ¶¶ 2-6; <u>Treitz</u> ¶¶ 2-7).

B.   <u>The Defendants</u>

The named defendants in the four lawsuits that are currently under consideration vary.  In the <u>Stein</u> consolidated class action, the plaintiffs sue only members of the Insurance Company Group.  In the <u>Gilmour</u>, <u>Trimble</u>, and <u>Treitz</u> individual actions, the plaintiffs sue members of the Insurance Company Group, the Sales Group, and the Attorney Group.  Despite this difference in named defendants, the complaints are virtually

identical in their description of the allegedly fraudulent scheme, as well as the various defendants' alleged participation therein.

### 1.   The Insurance Company Group

The Insurance Company Group consists of AmerUs Group Company ("AMH"); AmerUs Annuity Group Co. ("AAG"); American Investors Life Insurance Co. ("AILIC"); American Investors Sales Group "(AISG"); Creative Marketing International Corporation ("CMIC"); and Insurance Agency Marketing Services, Inc. ("IAMS").[2]

Defendant AMH is a holding company whose subsidiaries are primarily engaged in the business of marketing, underwriting, and distributing a broad range of individual life, annuity, and insurance deposit products to individuals and businesses.  AAG is a wholly owned subsidiary of AMH.  AILIC, AISG, CMIC, and IAMS are, in turn, wholly owned subsidiaries of AAG.  AILIC is in the business of underwriting and issuing annuities.  AISG, CMIC, and IAMS are engaged in the business of marketing, underwriting, and distributing a broad range of life insurance and annuity

---

[2]    The Second Amended Consolidated Class Action Complaint also names AmerUs Life Insurance Company ("AML").  The Insurance Company Group filed a supplemental motion to dismiss stating that AML had not been properly served and reserving all rights and defenses of AML.  AML may move to dismiss at a later date.

products.   (Stein ¶¶ 8-13, 46-54; Gilmour ¶¶ 8-13; Trimble ¶¶ 13-22; Treitz ¶¶ 17-26).

      2.   The Sales Group

The Sales Group consists of the individual salespeople, as well as the entities employing them, who executed the allegedly fraudulent scheme.  This group constitutes the conduit through whom the Insurance Company Group interacted directly with potential annuity purchasers.  These salespeople and entities include Brian Newmark ("Newmark"), Victoria Larson ("Larson"), Kenneth Krygowski ("Krygowski"), Diane Strope ("Ms. Strope"), Stephen Strope ("Mr. Strope"), Mary Chiavaroli ("Chiavaroli"), Ralph Spangler ("Spangler"), Michael Horowitz ("Horowitz"),[3] Estate Planning Advisers Corp. ("EPAC"), the Patriot Group, Best Estate Services ("BES"), and Guardian Insurance Agency, Inc. ("Guardian").  (Stein ¶¶ 6, 56-61; Gilmour ¶¶ 30-38; Trimble ¶¶ 36-38; Treitz ¶¶ 40-46).

---

[3]     Michael Horowitz is identified in the caption of the Gilmour complaint as "Michael Horowitz, a/k/a Michael Hamilton," and he is referred to in the body of the complaint as "Michael Hamilton."  Because "Michael Horowitz" appears from the caption of the case to be this defendant's true name, the Court will refer to him throughout this opinion as "Michael Horowitz" or simply "Horowitz."

### 3.   The Attorney Group

The Attorney Group consists of people who actually are, or at one time were, members of the bar of a state in the United States and who prepared living trust documents and/or other estate planning documents for senior citizens in connection with the purchase of the defendants' annuities.  These attorneys furthered the allegedly fraudulent scheme by allowing Sales Group members to use the attorney-client relationship to mask the salespeople's financial incentives, as well as discover assets that could be transferred into the Insurance Company Group's annuities.  Members of this group include Barry Bohmueller ("Bohmueller"), Brett Weinstein ("Weinstein"), and Jason Plaza ("Plaza").  (Stein ¶¶ 6, 55; Gilmour ¶¶ 19-29; Trimble ¶¶ 23-32; Treitz ¶¶ 27-36).

### C.   The Plaintiffs and Their Individual Allegations[4]

### 1.   Richard and Dena Stein

In early 2002, Richard and Dena Stein ("the Steins") responded to an advertisement for a seminar about financial

---

[4]    Richard and Dena Stein, Mary Lynch, Charlotte and Beryl Price, George Miller, Edward and Gloria Inferrera, Jean Ryles, Evelyn Edwards, and Jonathan Upchurch are named plaintiffs in the Stein consolidated class action complaint.  Walter Gilmour, Harcourt Trimble, III, and Margie Brennan Treitz are the plaintiffs in the three individual cases.

planning.  At the seminar, Larson and other representatives of
EPAC held themselves out as neutral estate planners who could
help the Steins by providing estate planning services.  Larson
also identified herself as a financial adviser and an employee of
attorney Bohmueller.  At no time did Larson or any of the other
presenters identify themselves as salespeople.  At the end of the
seminar, the Steins identified themselves to Larson and informed
her that they wished to work with her to plan their estate and
finances.

On or about April 23, 2002, Larson came to the Steins'
home and conducted an in-depth interview.  During this visit,
Larson made representations to the Steins about the purported
advantages that a living trust possesses over wills and probate.
At a subsequent visit, the Steins gave Larson $600, payable to
"Barry Bohmueller," for the purchase of a living trust.  During
the same visit, Larson convinced the Steins to liquidate
$20,147.88 held in an IRA to purchase an AILIC annuity on Mr.
Stein.

Larson did not, however, inform the Steins that the
annuity was a fifteen-year deferred annuity whose payments would
not start until Mr. Stein turned 90.  Larson also failed to
disclose the large penalties for any withdrawal that occurred
earlier than that date.  And finally, Larson represented that the
annuity would be available to Mrs. Stein, the beneficiary,

11

immediately following Mr. Stein's death, despite the fact that the money would have to be left with the defendants for five years after Mr. Stein's death to avoid paying substantial penalties.  (<u>Stein</u> ¶¶ 98-114).

      2.  <u>Mary Lynch</u>

Mary Lynch ("Lynch") came into contact with the defendants through a seminar on estate planning, which she heard about through an advertisement at a local senior center.  At the seminar, which was conducted by Larson and other sales agents, the presenters held themselves out as neutral estate planners and did not identify themselves as insurance salespeople.  The presenters also touted the benefits that living trusts held over probate and wills.

On or about July 19, 2001, Michael Ciccone ("Ciccone") came to Lynch's home and conducted an in-depth interview with her.  Following this visit, Ciccone, Larson, and Krygowski came to Lynch's home on a number of additional occasions, each time making representations about the advantages that living trusts possess over wills and probate.  At no time during any of these visits did Ciccone, Larson, or Krygowski identify themselves as salespeople.  These members of the Sales Group instead held themselves out as disinterested estate planners who were working with attorney Bohmueller to best serve Lynch's estate planning needs.

On or about July 19, 2001, Lynch decided to set up a living trust, but she declined to purchase an annuity.  Lynch accordingly gave Ciccone a check for $1,795.00, payable to "Barry Bohmueller," for the purchase of a living trust.  Despite Lynch's decision to purchase only a living trust, members of the Sales Group nevertheless continued to urge her to purchase one or more of the defendants' annuities.  After several follow-up contacts by Larson and other EPAC personnel, Lynch finally decided to purchase an AILIC annuity in early 2003.  Lynch liquidated $65,000 to purchase this annuity.

At the time Lynch purchased the annuity, neither Larson nor any other members of the Sales Group disclosed the fact that payments on the annuity would not begin until Lynch reached 125 years of age.  The salespeople also failed to disclose the substantial charges associated with early withdrawal of the principal invested.  Not only did the salespeople fail to disclose these attributes, but Larson told Lynch that the annuity funds would be available to her beneficiaries immediately following her death.  In truth, the funds would need to be left with the defendants for five years after Lynch's death to avoid the beneficiaries' incurring substantial penalties.  (Stein ¶¶ 115-34).

3.   <u>Beryl and Charlotte Price</u>

In response to a newspaper advertisement, Beryl and Charlotte Price ("the Prices") attended a seminar on EPAC's estate planning services in early 2002.  At the seminar, Larson and other EPAC representatives made a presentation detailing how EPAC's services could benefit the Prices and the other attendees. Shortly after the seminar, Larson called the Prices twice and arranged to meet with them in their home.

During that meeting, which occurred on or around January 23, 2002, Larson spoke to the Prices about the purported advantages of a living trust and led the Prices to believe that she was a qualified, experienced estate planner working with the office of attorney Bohmueller.  Larson did not, at any time, disclose that she was a licensed insurance agent or that she received commissions for the sale of living trusts and annuities.

Directly after the meeting, the Prices gave Larson a check for $1,845.00, payable to "Bohmueller Law Offices," for the purchase of a living trust.  On or around February 28, 2002, Larson returned to the Prices' home to deliver a loose-leaf binder containing the living trust documents that attorney Bohmueller had ostensibly prepared.  Larson told the Prices that she or attorney Bohmueller would take all the necessary actions to establish and fund the living trust.  She did not, however, inform the Prices that they needed to transfer their residence or

14

any other assets into the trust, and she did not do so on their behalf.

In the course of selling the Prices the living trust and delivering the documents associated with it, Larson also urged the Prices to purchase two AILIC annuities.  Larson told the Prices that the rate of return on the annuities would be greater than what they were earning from their current investments and that the interest rate on the annuities could only increase.  When the Prices told Larson that they wanted 25% of their investment to be available for distribution the following year, she assured them that the annuities would allow such a distribution.  She did not, however, disclose that the annuities imposed penalties for early withdrawals.  Convinced by Larson's sales pitch, the Prices liquidated a total of $61,000 from their IRA accounts to purchase two AILIC annuities.  (Stein ¶¶ 135-58).

        4.   Joseph Healy

In or around August of 2001, Joseph Healy ("Healy") attended an estate planning seminar conducted by Larson and other EPAC personnel.  At the seminar, Larson gave Healy a piece of paper indicating that she was a "Certified Senior Adviser" for EPAC.  Sometime after the seminar, Larson and Krygowski visited Healy at his home to discuss his estate plan and the purported advantages of a living trust.  Larson and Krygowski also led

15

Healy to believe that they were qualified and experienced estate planners working with attorney Bohmueller's office.  Larson even gave Healy a card from "Bohmueller Law Offices" on which she had written her name.  Neither Larson nor Krygowski told Healy that they were licensed insurance agents or that they received commissions for the sale of living trusts and annuities.

On or around August 29, 2001, Healy gave Krygowski a check for $1,795.00, payable to "Bohmueller Law Offices," for the purchase of a living trust.  Over the next few months, Larson and Krygowski persuaded Healy to purchase an AILIC deferred annuity with an initial premium of $106,916.87.  Neither Larson nor Krygowski disclosed that payments on the annuity would not begin for fifteen years after purchase or that any withdrawals of principal in the first ten years after purchase would be subject to substantial penalties.  (Stein ¶¶ 159-73).

### 5.   Jean Ryles

Jean Ryles ("Ryles") was induced into purchasing two AILIC annuities by unnamed representatives of American Family Legal Plan ("AFLP").  These salespeople came to Ryles' home, holding themselves out as disinterested estate planners working for, or on behalf of, attorney Weinstein, and made a presentation regarding the benefits of their services.  During this presentation, the salespeople extolled the advantages that living trusts have over probate and wills.

16

As a result of this presentation, Ryles purchased a living trust, as well as two AILIC annuities whose initial premiums totaled over $80,000.  At no time during the presentation did the AFLP representatives disclose to Ryles that they were, in fact, insurance salespeople, or that the annuities contained early-withdrawal penalties.  (Stein ¶¶ 174-82).

6.  George Miller

Sometime in 1999, George Miller ("Miller") responded by mail to a newspaper advertisement concerning Weinstein living trusts.  Larson and other representatives of the Addison Group responded by informing Miller that they could provide estate planning services that would benefit him.  After telephoning Miller to arrange a meeting, Larson came to Miller's home on or about June 22, 1999.

On that date, Larson spoke with Miller about the supposed advantages of a living trust and led him to believe that she was a qualified estate planner working with attorney Weinstein.  She did not inform Miller that she was an insurance agent or that she received commissions from the sale of annuities.  On the day of the meeting, Miller gave Larson a check for $1,995.00, payable to attorney Weinstein, for the purchase of a living trust.

During subsequent visits to Miller's home, Mr. Strope, another member of the Sales Group, persuaded Miller to liquidate

17

$215,000 from his investment portfolio of predominately blue-chip investments to purchase an annuity from American Equity Investment Life Insurance Company, Inc. ("American Equity").  Mr. Strope did not disclose that the annuity would not make any payments for ten years or that it imposed surrender charges for early withdrawals of principal.

Mr. Strope did, however, tell Miller that the rate of return on the annuity would be 26.95% per annum.  In 2000, Miller received a statement in the mail from American Equity and discovered that the rate of return for the annuity was 3%, as opposed to the 26.95% that Mr. Strope had promised.  When Miller complained to Mr. Strope, Mr. Strope blamed the decreased rate of return on the decline in the stock market.

Mr. Strope then convinced Miller to purchase an annuity from AILIC.  Mr. Strope did not disclose to Miller that this annuity would not make payments for fifteen years or that it also imposed early-withdrawal penalties.  (Stein ¶¶ 183-200).

### 7.   Edward and Gloria Inferrera

Edward and Gloria Inferrera ("the Inferreras") were induced into purchasing two of the defendants' annuities by Charles Studebaker ("Studebaker") of Studebaker and Associates, a duly appointed life insurance agent of the Insurance Company Group.  The initial premium payments on these annuities totaled approximately $15,000.00.  In selling the Inferreras the

18

annuities, Studebaker used the defendants' standardized marketing materials and sales presentations.

Shortly after purchasing the annuities, the Inferreras incurred substantial medical and other expenses associated with their deteriorating health. The Inferreras consequently requested the surrender of their two annuities. Upon being informed that surrender charges in excess of $6,000 would be imposed, the Inferreras decided to liquidate other investments to meet their cash-flow needs. The Inferreras anticipate that they will soon be forced to withdraw a substantial portion of, if not surrender, their annuities. As a result, they will be subject to the surrender charges associated with such an action. (Stein ¶¶ 201-05).

### 8.   Evelyn Edwards

Evelyn Edwards ("Edwards") was induced into purchasing an AILIC annuity by Christopher Grant Cary ("Cary"), one of the defendants' sales agents. Cary convinced Edwards to purchase the annuity by using the defendants' standardized marketing materials, forms, and policies. At no time did Cary fully disclose the risks and adverse information associated with the purchase of the defendants' deferred annuities. Edwards' initial premium payment for the annuity was $12,000.00, followed by a second payment of $15,000.00.

19

Edwards' health has deteriorated, and she is no longer capable of living on her own.  She has therefore moved into an assisted living facility in New York State.  Edwards is running out of money and will need to surrender her annuity in the near future.  (<u>Stein</u> ¶¶ 206-09).

9.   <u>Jonathan Upchurch/Edith Newcomer</u>

Jonathan Upchurch ("Upchurch") is the nephew of, and attorney in fact for, plaintiff Edith Newcomer ("Newcomer"). Newcomer is a retired schoolteacher who would occasionally attend neighborhood seminars that provided senior citizens with financial advice.  At one of these seminars, Newcomer was introduced to Patrick Letizia ("Letizia"), who was a licensed sales agent of AILIC.  In late 1999, Letizia, who claimed to be an expert in money management and annuities, told Newcomer that an annuity would help her grow her money.  Based on Letizia's representation, Newcomer purchased a deferred annuity from Provident Mutual Life and Annuity Company of America ("Provident") for an initial premium of $521,347.68.

In approximately September of 2002, Letizia instructed Newcomer to terminate her Provident annuity and purchase a new deferred annuity from AILIC.  As a result of her early termination of the Provident policy, Newcomer was subject to a $44,074.42 surrender charge.  Newcomer then used the balance that she received from Provident, $568,070.32, to purchase a fifteen-

year deferred annuity from American Investors whose payments would not begin until Newcomer reached 102 years of age. (<u>Stein</u> ¶¶ 210-18).

      10.  <u>Walter and Suzanne Gilmour</u>

Walter and Suzanne Gilmour ("the Gilmours") were approached on March 22, 2001, by Horowitz, who knocked on the door of the Gilmours' residence and identified himself as a qualified estate planner who was working with attorney Bohmueller.  Horowitz did not, on that day or any other, reveal that he was in fact a salesperson employed by the Patriot Group.  Instead, Horowitz promoted and touted the advantages that living trusts hold over wills and probate.  These representations were substantially similar to those that were contained in the Insurance Company Group's standardized marketing materials and sales presentations.  As a result of Horowitz's representations, the Gilmours gave Horowitz a check for $1,850.00, payable to "Bohmueller Law Offices," for the purchase of a living trust.

Also at that meeting, Horowitz falsely represented to the Gilmours that if they put their money into annuities, future annuity payments would be income-tax and inheritance-tax free.  At subsequent visits, Mr. Strope, another employee of the Patriot Group, repeated similar misrepresentations and assured the Gilmours that the purchase of annuities would be a way of placing money in the hands of the Gilmours' beneficiaries immediately,

while avoiding probate taxes.  The salesmen eventually convinced the Gilmours to liquidate $1.5 million of their then-existing assets to purchase two AILIC annuities.

At no time did Horowitz or Mr. Strope reveal that they would receive commissions for selling the AILIC annuities. Horowitz and Mr. Strope also failed to disclose the substantial penalties that would accrue if one of the Gilmours' beneficiaries attempted to withdraw any of the annuities' principal within five years of the annuitant's death.  When Mrs. Gilmour passed away on February 17, 2005, however, Mr. Gilmour learned that immediate payment of the death benefits from Mrs. Gilmour's AILIC annuity would carry these substantial penalties.  (Gilmour ¶¶ 117-71).

11.  <u>Harcourt Trimble, III/Harcourt and Barbara Trimble</u>

Harcourt Trimble, III ("Trimble, III"), is the co-executor of the estate of his father and mother, Harcourt and Barbara Trimble ("the Trimbles").  Mrs. Trimble passed away on January 7, 2002, and Mr. Trimble passed away on March 21, 2002.

The Trimbles were originally approached by the defendants on May 5, 2001, when Spangler, an employee of the Patriot Group, came to their home.  On that day, Spangler held himself out as a neutral, qualified estate planner and touted the advantages that living trusts possess over wills and probate. Spangler claimed that such instruments avoid probate, save attorneys' fees, assure privacy after death, permit quicker

22

distribution of assets, avoid court challenges, and are required to avoid guardianship. As a result of these representations, the Trimbles purchased a living trust by giving Spangler a check made payable to "Bohmueller Law Offices" in the amount of $1,895.00.

At this meeting and at subsequent meetings, Spangler also discussed the benefits of the Insurance Company Group's annuities. Spangler falsely claimed that any money the Trimbles used to purchase these annuities, as well as any future payments from these annuities, would be free of inheritance and income taxes. In addition, Spangler did not disclose (i) that any such annuity could not be canceled or rescinded without penalty, (ii) that the 8.75% interest rate was a first-year interest rate only, and (iii) that death benefits made under the annuity were subject to substantial penalties unless the beneficiary agreed to leave the funds with the Insurance Company Group for five years after the death of the annuitant. As a result of these misrepresentations and omissions, the Trimbles liquidated $666,000 of their stock portfolio to purchase a fifteen-year deferred annuity that would not begin making payments until Mrs. Trimble was 100 and Mr. Trimble was 104.

After the Trimbles passed away, Trimble, III, found the documents for the living trust that his parents had set up through defendant Bohmueller and accordingly called the attorney. In response to the call, Weinstein contacted Trimble, III, and informed him that he worked with Bohmueller and would be the

23

attorney handling the estate and affairs of the plaintiff's parents.  Weinstein did not inform Trimble, III, that contrary to the representations made to his parents, the living trust did not avoid probate, attorneys' fees, or costs involved with processing their estate.

Weinstein proceeded to open the probate estates and to have the inheritance and income tax returns prepared in 2001.  In connection with these returns, Trimble, III, paid over $57,000 in inheritance taxes, interest, and penalties.  Trimble, III, also paid Weinstein $19,610.00 in attorneys' fees.  In addition, Trimble, III, was personally assessed taxes, interest, and penalties in the amount of $156,762.00 for the 2003 tax year, due to the allegedly deficient estate planning and legal advice proffered by Weinstein and Bohmueller.  (Trimble ¶¶ 82-144).

### 12.  Margie Brennan Treitz/Gilbert and Joanne Brennan

Margie Brennan Treitz ("Treitz") is the personal representative of her mother and father, Gilbert and Joanne Brennan ("the Brennans").  Mr. Brennan passed away in July of 2003, and Mrs. Brennan passed away in April of 2006.

The Brennans were originally approached by the defendants on January 26, 2001, when Krygowski, an employee of EPAC, came to their home.  At this meeting, Krygowski held himself out as a neutral, qualified estate planner and touted the advantages that living trusts possess over wills and probate.

Krygowski claimed that such instruments avoid probate, save
attorneys' fees, assure privacy after death, permit quicker
distribution of assets, avoid court challenges, and are required
to avoid guardianship.  As a result of these representations, the
Brennans purchased a living trust by giving Krygowski a check
made payable to "Bohmueller Law Offices" in the amount of
$1,795.00.

At this meeting and at subsequent meetings, Krygowski,
who was later joined by Larson, also discussed the benefits of
the Insurance Company Group's annuities.  Krygowski and Larson
falsely claimed that any money the Brennans used to purchase
these annuities, as well as any future payments from these
annuities, would be free of inheritance and income taxes.  In
addition, Krygowski and Larson did not disclose (i) that any such
annuity could not be canceled or rescinded without penalty, (ii)
that the 6.75% interest rate was a first-year interest rate only,
and (iii) that death benefits made under the annuity were subject
to substantial penalties unless the beneficiary agreed to leave
the funds with the Insurance Company Group for five years after
the death of the annuitant.  As a result of these
misrepresentations and omissions, the Brennans purchased an AILIC
annuity for an initial premium payment of $130,290.54.  The
monthly payments on this annuity would not have started until
2016, when Mrs. Brennan would have been 85 and Mr. Brennan would
have been 92.

25

On April 15, 2002, Larson persuaded the Brennans to liquidate more of their assets and to purchase two more AILIC annuities. At this time, Mr. Brennan purchased a fifteen-year deferred annuity for an initial premium payment of $45,678.98, and Mrs. Brennan purchased a fifteen-year deferred annuity for an initial premium payment of $71,709.33. Payments on these annuities would not have begun until Mr. Brennan was 93 and Mrs. Brennan was 87.

In March of 2003, Mr. Brennan was hospitalized, and his family contacted Larson to change the trustee and executor of Mr. Brennan's living trust from his daughter Margie to his daughter Ann Marie. In response, Chiavaroli, another employee of EPAC, contacted Plaza, an attorney employed at Bohmueller's law office, to make the requested change. Plaza complied and overnighted the documents with an unsigned Bohmueller cover letter and instructions to Ms. Strope, another employee of EPAC. The next day, Larson brought the documents to the hospital and the Brennans signed them. On July 23, 2003, Mr. Brennan passed away.

At the time of his death, Mr. Brennan had two AILIC annuities with a combined accumulated value of $188,657.24. Mrs. Brennan was the beneficiary of both annuities, but she did not have any of the documents pertaining to the annuities. On September 4, 2003, Larson approached Mrs. Brennan and persuaded her to purchase a new, fifteen-year deferred annuity from AmerUs for an initial premium payment of $25,942.00. Shortly after this

policy application was made, Larson told Mrs. Brennan that she should also liquidate her remaining assets, as well as Mr. Brennan's two annuities, and put the proceeds into this new annuity.

In making these recommendations, Larson did not inform Mrs. Brennan that she could utilize the provisions of her husband's annuities to transfer to herself the annuities' entire accumulated value. Instead, Larson caused Mrs. Brennan to elect the lump-sum surrender value of Mr. Brennan's annuities, which resulted in Mrs. Brennan incurring a $17,344.49 surrender charge. When Mrs. Brennan asked Larson about the approximately $20,000 "fee" that was deducted from the annuity, Larson told her that the surrender charge was merely a one-time fee that the government charged when spouses switch names on annuities. In truth, Larson recommended that Mrs. Brennan elect such a payout because it would allow Larson to collect an additional commission from Mrs. Brennan's placing the proceeds of her husband's annuities into the new annuity.

At no point did Krygowski or Larson disclose that they were insurance sales agents who would be paid commissions from the Insurance Company Group. Furthermore, the living trust that the Brennans purchased did not avoid probate, fees, or inheritance taxes. (Treitz ¶¶ 92-167).

27

II.  Procedural History and Overview of the Claims

        In an opinion dated June 2, 2006, this Court dismissed two putative class actions[5] in this multidistrict litigation on the ground that the plaintiffs had failed to plead a valid RICO enterprise.  In re Am. Investors Life Ins. Co. Annuity Mktg. & Sales Practices Litig., MDL No. 1712, 2006 WL 1531152, at *7 (E.D. Pa. June 2, 2006).  The plaintiffs in those class actions, all of whom are named plaintiffs in the Stein consolidated class action, sued several insurance companies (some of whom were unrelated, competitor companies), sales agents, and lawyers for damages arising from an allegedly fraudulent scheme to sell unnecessary and unsuitable estate planning instruments and annuities.  Id. at *1.  The Court held that although the plaintiffs did allege that the defendants were aware of each other's actions and that each defendant performed a critical role within the alleged scheme, the plaintiffs did not allege that an organizational structure connected or controlled the various defendants.  Id. at *7-*8.

        According to the Court, the complaints did not allege how the attorneys and the insurance companies were related.  Id. Furthermore, the complaints failed to allege how certain competitor insurance companies worked together toward a common

---

[5]    The named plaintiffs in these two putative class actions consisted of the Prices, Healy, and Miller.  In re Am. Investors Life Ins. Co. Annuity Mktg. & Sales Practices Litig., MDL No. 1712, 2006 WL 1531152, at *3-*10 (E.D. Pa. June 2, 2006).

goal.  Id. at *8.  The Court concluded that the plaintiffs

described what appeared to be an enterprise from the outside, but

what turned out to be a collection of entities and individuals

that contained no organizational structure on the inside.  Id.

Such allegations, the Court reasoned, were insufficient to

demonstrate the existence of a RICO enterprise.  Id.

     The Court accordingly dismissed the plaintiffs' RICO

claims without prejudice and allowed the plaintiffs to file

amended complaints.  Id. at *12.  The Court also discussed the

other elements of a RICO claim so that the plaintiffs would have

guidance if they filed such amendments.  See id. at *9-*12.

     The plaintiffs have now amended their complaints, and

the defendants have responded by filing a new round of motions to

dismiss.  The amended complaints bring claims against the

defendants as follows:

| Claim | Stein | Gilmour | Trimble | Treitz |
|-------|-------|---------|---------|--------|
| Violation of RICO | AMH, AAG, AILIC, AML, CMIC, IAMS | AMH, AAG, AILIC, CMIC, AISG, Mr. Strope, Horowitz, BES, Patriot Group, Guardian, Bohmueller | AMH, AAG, AILIC, CMIC, Patriot Group, Spangler, Weinstein, Bohmueller | AMH, AAG, AILIC, CMIC, Newmark, Larson, Krygowski, Ms. Strope, Chiavaroli, EPAC, Weinstein, Plaza, Bohmueller |

| | | | | |
|---|---|---|---|---|
| Conspiracy to Violate RICO | AMH, AAG, AILIC, AML, CMIC, IAMS | AMH, AAG, AILIC, CMIC, AISG, Mr. Strope, Horowitz, BES, Patriot Group, Guardian, Bohmueller | AMH, AAG, AILIC, CMIC, Patriot Group, Spangler, Weinstein, Bohmueller | AMH, AAG, AILIC, CMIC, Newmark, Larson, Krygowski, Ms. Strope, Chiavaroli, EPAC, Weinstein, Plaza, Bohmueller |
| Breach of Fiduciary Duty | AMH, AAG, AILIC, AML, CMIC, IAMS | AMH, AAG, AILIC, CMIC, AISG, Mr. Strope, Horowitz, BES, Patriot Group, Guardian, Bohmueller | AMH, AAG, AILIC, CMIC, Patriot Group, Spangler, Weinstein, Bohmueller | AMH, AAG, AILIC, CMIC, Newmark, Larson, Krygowski, Ms. Strope, Chiavaroli, EPAC, Weinstein, Plaza, Bohmueller |
| Negligent Supervision | AMH, AAG, AILIC, AML, CMIC, IAMS | AMH, AAG, AILIC, CMIC, AISG, Bohmueller | AMH, AAG, AILIC, CMIC, Weinstein, Bohmueller | AMH, AAG, AILIC, CMIC, Weinstein, Plaza, Bohmueller |
| Unjust Enrichment | AMH, AAG, AILIC, AML, CMIC, IAMS | AMH, AAG, AILIC, CMIC, AISG, Mr. Strope, Horowitz, BES, Patriot Group, Guardian, Bohmueller | AMH, AAG, AILIC, CMIC, Patriot Group, Spangler, Weinstein, Bohmueller | AMH, AAG, AILIC, CMIC, Newmark, Larson, Krygowski, Ms. Strope, Chiavaroli, EPAC, Weinstein, Plaza, Bohmueller |

| | | | | |
|---|---|---|---|---|
| Fraudulent Misrepresentation | | AMH, AAG, AILIC, CMIC, AISG, Mr. Strope, Horowitz, BES, Patriot Group, Guardian, Bohmueller | AMH, AAG, AILIC, CMIC, Patriot Group, Spangler, Weinstein, Bohmueller | AMH, AAG, AILIC, CMIC, Newmark, Larson, Krygowski, Ms. Strope, Chiavaroli, EPAC, Weinstein, Plaza, Bohmueller |
| Negligent Misrepresentation | | AMH, AAG, AILIC, CMIC, AISG, Mr. Strope, Horowitz, BES, Patriot Group, Guardian, Bohmueller | AMH, AAG, AILIC, CMIC, Patriot Group, Spangler, Weinstein, Bohmueller | AMH, AAG, AILIC, CMIC, Newmark, Larson, Krygowski, Ms. Strope, Chiavaroli, EPAC, Weinstein, Plaza, Bohmueller |
| Civil Conspiracy | | AMH, AAG, AILIC, CMIC, AISG, Mr. Strope, Horowitz, BES, Patriot Group, Guardian, Bohmueller | AMH, AAG, AILIC, CMIC, Patriot Group, Spangler, Weinstein, Bohmueller | AMH, AAG, AILIC, CMIC, Newmark, Larson, Krygowski, Ms. Strope, Chiavaroli, EPAC, Weinstein, Plaza, Bohmueller |
| Professional Negligence | | Bohmueller | AMH, AAG, AILIC, CMIC, Patriot Group, Spangler, Weinstein, Bohmueller | Weinstein, Plaza, Bohmueller |

31

| | | | | |
|---|---|---|---|---|
| Breach of Contract | | AMH, AAG, AILIC, CMIC, AISG, Mr. Strope, Horowitz, BES, Patriot Group, Guardian, Bohmueller | AMH, AAG, AILIC, CMIC, Patriot Group, Spangler, Weinstein, Bohmueller | AMH, AAG, AILIC, CMIC, Newmark, Larson, Krygowski, Ms. Strope, Chiavaroli, EPAC, Weinstein, Plaza, Bohmueller |
| Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law | | AMH, AAG, AILIC, CMIC, AISG, Mr. Strope, Horowitz, BES, Patriot Group, Guardian, Bohmueller | AMH, AAG, AILIC, CMIC, Patriot Group, Spangler, Weinstein, Bohmueller | AMH, AAG, AILIC, CMIC, Newmark, Larson, Krygowski, Ms. Strope, Chiavaroli, EPAC, Weinstein, Plaza, Bohmueller |
| Negligence Per Se | | AMH, AAG, AILIC, CMIC, AISG, Mr. Strope, Horowitz, BES, Patriot Group, Guardian, Bohmueller | AMH, AAG, AILIC, CMIC, Patriot Group, Spangler, Weinstein, Bohmueller | AMH, AAG, AILIC, CMIC, Newmark, Larson, Krygowski, Ms. Strope, Chiavaroli, EPAC, Weinstein, Plaza, Bohmueller |
| Accounting | | AMH, AAG, AILIC, CMIC, AISG, Mr. Strope, Horowitz, BES, Patriot Group, Guardian, Bohmueller | AMH, AAG, AILIC, CMIC, Patriot Group, Spangler, Weinstein, Bohmueller | AMH, AAG, AILIC, CMIC, Newmark, Larson, Krygowski, Ms. Strope, Chiavaroli, EPAC, Weinstein, Plaza, Bohmueller |

The following motions to dismiss are pending before the Court:

- AMH, AAG, AILIC, AML, CMIC, IAMS, and AISG's motions to dismiss and for judgment on the pleadings in all four complaints;

- The Patriot Group's motion to dismiss the Gilmour complaint;

- Brian Newmark, EPAC, Larson, Ms. Strope, Krygowski, and Chiavaroli's motion to dismiss the Treitz complaint;

- Attorney Bohmueller's motions to dismiss the Gilmour, Trimble, and Treitz complaints; and

- Attorneys Weinstein and Plaza's motions to dismiss the Trimble and Treitz complaints.

III. Analysis[6]

The Court will first discuss which defendants should be dismissed because there are no allegations of wrongdoing in fact against them.  The Court will then turn to the merits of the plaintiffs' RICO claims.  And finally, the Court will address the merits of the plaintiffs' various state law claims.

---

[6]   When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court accepts all facts and allegations listed in the complaint as true and construes them in the light most favorable to the plaintiff.  H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 249 (1989); Rocks v. City of Phila., 868 F.2d 644, 645 (3d Cir. 1989).  "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  When considering a motion for judgment on the pleadings that is based on failure to state a claim, a Court should apply the same standard as that which is a applied to such a motion brought pursuant to Rule 12(b).  Turbe v. Virgin Islands, 938 F.2d 427, 428 (3d Cir. 1991).

A.    <u>Defendants Dismissed for Failure to State Any Claim</u>

The Court will dismiss Chiavaroli and Ms. Strope from the <u>Treitz</u> case because the complaint does not allege that they participated in any wrongdoing with respect to the plaintiffs in that lawsuit.  The sole allegations against Chiavaroli and Ms. Strope are that (i) the two individuals were employed by Bohmueller and/or one or more of the other defendants, (ii) Chiavaroli had communications with Plaza regarding the amendment to Mr. Brennan's living trust, and (iii) Ms. Strope was the addressee on an overnighted package of documents relating to the amendment.  (<u>Treitz</u> ¶¶ 45-46, 112-13).

The Court will also dismiss Newmark from the <u>Treitz</u> case because the complaint does not allege that Newmark personally participated in any wrongdoing with respect to the plaintiffs in that lawsuit.  Newmark is not alleged to have ever met the Brennans, nor is he alleged to have personally participated in the sale of any annuities to the Brennans.  Newmark's sole connection to the Brennans' purchase of annuities is his status as the President of EPAC, the company that employed the sales agents who allegedly made misrepresentations to the Brennans in connection with their annuity purchase.  (<u>Treitz</u> ¶ 42).  Such an allegation is insufficient to state a claim against Newmark.  <u>See</u> <u>Wicks v. Milzoco Builders, Inc.</u>, 470 A.2d 86, 90 (Pa. 1983) (noting the "general, if not universal, rule" that an

34

officer of a corporation is not personally liable to third persons for the acts of other agents, officers, or employees of the corporation, unless he specifically directed the particular act to be done, or participated or cooperated therein).

The Court will likewise dismiss AMH from all cases because the plaintiffs' sole allegation against this defendant is that it was the holding company for AAG, AILIC, CMIC, IAMS, and AISG.[7]  There is no piercing the corporate veil or alter ego claim alleged in any of the complaints.

B.    RICO

1.    Claim Under Section 1962(c)

All the plaintiffs have alleged that the defendants violated section 1962(c) of the RICO statutes.  Section 1962 provides, in relevant part, that "[i]t shall be unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."  18 U.S.C. § 1962(c) (2000).  To state a claim

---

[7]     In each one of their motions to dismiss, the Insurance Company Group defendants argue that the plaintiffs have failed to allege any claims of wrongdoing against one or more of the related insurance companies.  At this point in the litigation, the Court will not dismiss any of these corporations on this basis, except AMH.  AAG and AILIC are alleged to have participated in the alleged scheme by underwriting certain of the plaintiffs' annuities.  (Stein ¶¶ 45, 106).  CMIC, IAMS, and AISG are alleged to have developed the allegedly fraudulent marketing materials.  (Stein ¶¶ 96-97).

for a violation of section 1962(c), a plaintiff must allege that each defendant (i) conducted or participated in the conduct (ii) of an enterprise (iii) through a pattern (iv) of racketeering activity.  Lum v. Bank of Am., 361 F.3d 217, 223 (3d Cir. 2004). In addition, to have standing to bring such a claim, a plaintiff must demonstrate that he or she has been injured in his or her business or property by the conduct constituting the violation. Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985).

The defendants argue that the plaintiffs have not adequately alleged one or more of these elements.  In addressing these arguments, the Court will begin by determining whether the plaintiffs have adequately pled the existence of a RICO enterprise.  The Court will then discuss the "conduct or participation," and "racketeering activity" elements of the claim.[8]  The Court will conclude by discussing whether the plaintiffs have alleged an injury to their business or property.

a.   Existence of an Enterprise

RICO defines the term "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  The plaintiffs allege an association-in-fact enterprise consisting of

---

[8]   The defendants do not argue that the plaintiffs have failed to plead the "pattern" element of a section 1962(c) claim.  The Court therefore will not discuss this element.

members of the Insurance Company Group, the Sales Group, and the Attorney Group.  The Court finds that the plaintiffs have pled a valid RICO enterprise.

To establish the existence of an association-in-fact enterprise, a plaintiff must prove: (i) that there exists an ongoing organization, formal or informal; (ii) that the various associates of the organization function as a continuing unit; and (iii) that the organization has an existence separate and apart from the alleged pattern of racketeering activity.  <u>United States v. Turkette</u>, 452 U.S. 576, 583 (1981); <u>United States v. Riccobene</u>, 709 F.2d 214, 221 (3d Cir. 1983).

(1)   <u>The Existence of an Ongoing Organization</u>

In <u>Riccobene</u>, the United States Court of Appeals for the Third Circuit explained that the "ongoing organization" attribute relates to the superstructure or framework of the alleged enterprise.  <u>Riccobene</u>, 709 F.2d at 222.  To satisfy this attribute, a plaintiff must demonstrate that some sort of hierarchical or consensual structure exists within the group for the making of decisions.  <u>Id.</u>  According to the Court of Appeals, "[t]here must be some mechanism for controlling and directing the affairs of the group on an on-going, rather than ad hoc, basis." <u>Id.</u>  Such a requirement does not mean, however, that every decision must be made by the same person; authority may be delegated.  <u>Id.</u>

In the present case, the defendants argue that the plaintiffs' allegations are insufficient to satisfy the "ongoing organization" attribute of a RICO enterprise.  According to the defendants, the plaintiffs fail to allege that a structure existed for making decisions and resolving disputes in carrying out the alleged scheme.  Furthermore, the defendants argue that the plaintiffs' allegations negate the "ongoing organization" attribute because they fail to allege any connection between the Insurance Company Group and the Attorney Group.  The plaintiffs' allegations, the defendants argue, show only the ability of the Insurance Company Group to oversee the Sales Group's sale of annuities, not the Attorney Group's provision of legal services.

The Court finds that the plaintiffs have properly pled the "ongoing organization" attribute of a RICO enterprise.  According to the plaintiffs, the Insurance Company Group stood at the head of the alleged enterprise and directed the activities of the association-in-fact on an ongoing basis.  (Stein ¶¶ 248, 263; Gilmour ¶¶ 192, 210; Trimble ¶¶ 165, 183; Treitz ¶¶ 188, 206).  The Insurance Company Group wielded this control by developing a highly structured sales scheme, which it disseminated to the Sales Group members via standardized marketing materials and sales presentations.  (Stein ¶¶ 12, 78; Gilmour ¶ 53; Trimble ¶ 147-50; Treitz ¶¶ 170-73).  As directed by the Insurance Company Group, the Sales Group members then communicated this scheme to

38

members of the Attorney Group.  (<u>Stein</u> ¶ 257; <u>Gilmour</u> ¶¶ 203, 215; <u>Trimble</u> ¶¶ 176, 188; <u>Treitz</u> ¶¶ 199, 211).

Under this scheme, the members of each group played specific roles.  The Insurance Company Group designed and disseminated the allegedly fraudulent sales scheme, provided "leads" that consisted of potential annuity purchasers, and underwrote the annuities that were ultimately sold.  The Sales Group members followed the Insurance Company Group's detailed instructions by associating with attorneys who were willing to participate in the scheme and then executing the scheme according to the Insurance Company Group's standardized marketing materials and sales presentations.  And finally, the Attorney Group also followed the instructions of the Insurance Company Group, which called for the attorneys to allow members of the Sales Group to use the living-trust creation process as a tool for selling annuities.  (<u>Stein</u> ¶¶ 14-25, 233; <u>Gilmour</u> ¶¶ 174-81; <u>Trimble</u> ¶¶ 147-54; <u>Treitz</u> ¶¶ 170-77).

According to the plaintiffs, the Insurance Company Group maintained control over the alleged association-in-fact by (i) disseminating the standardized marketing materials and sales presentations to the Sales Group members, (ii) instructing the Sales Group members to communicate the scheme to the Attorney Group, (iii) exercising authority to approve or disapprove all written marketing materials that were shown to potential annuity purchasers, (iv) underwriting the annuities that were sold

39

pursuant to the scheme, and (iv) paying the Sales Group members commissions for the sale of annuities.  (<u>Stein</u> ¶¶ 248, 263; <u>Gilmour</u> ¶¶ 192, 210; <u>Trimble</u> ¶¶ 165, 183; <u>Treitz</u> ¶¶ 188, 206).

Although it is true that the plaintiffs do not allege that the Insurance Company Group paid the members of the Attorney Group directly, the plaintiffs do allege that the members of the Attorney Group followed the Insurance Company Group's instructions in executing the scheme.  (<u>Stein</u> ¶¶ 265-68; <u>Gilmour</u> ¶¶ 212-16; <u>Trimble</u> ¶¶ 185-89; <u>Treitz</u> ¶¶ 208-12).  The Attorney Group members followed these instructions because, according to the plaintiffs, the entire scheme would not work unless they did so.  (<u>Stein</u> ¶¶ 257-58; <u>Gilmour</u> ¶ 204; <u>Trimble</u> ¶ 177; <u>Treitz</u> ¶ 200).  Thus, the Insurance Company Group wielded control over the Attorney Group members by providing them with a scheme whose success -- and therefore the attorneys' ability to make money from the sale of living trusts incident to the execution of the scheme -- depended on the attorneys' following the instructions set forth in the marketing materials and sales presentations.  (<u>Id.</u>)

The present complaints are distinguishable from the complaints that the Court dismissed for failure to plead a valid RICO enterprise in its previous opinion.  <u>See</u> <u>In re Am. Investors Life Ins. Co.</u>, 2006 WL 1531152.  In the previous complaints, the plaintiffs failed to allege that an organizational structure connected or controlled the various associates of the alleged

40

enterprise.  Id. at *7-*8.  The previous complaints did not allege any connection at all between the Insurance Company Group and the Attorney Group, and the complaints failed to allege how certain competitor insurance companies worked together toward a common goal.  Id.

Here, the plaintiffs have alleged a highly structured organization that was overseen and directed by the Insurance Company Group.  According to the plaintiffs, the defendants were not simply a string of participants in a scheme that lacked any distinct structure or system of authority.  Rather, the enterprise, as alleged, depended for its success on the participants' following the instructions developed and disseminated by the Insurance Company Group -- instructions that allegedly governed the conduct of the association-in-fact from the identification of the sales target all the way to the sale of the actual annuity, complete with the reward system that motivated the sales agents and attorneys to repeat the process.  See In re Nat'l W. Life Ins. Deferred Annuity Litig., 467 F. Supp. 2d 1071, 1081 (S.D. Cal. 2006).

> (2)   The Various Associates Functioned as a
>       Continuing Unit

The second essential attribute of an enterprise under RICO is that the various associates of the alleged enterprise must function as a continuing unit.  Riccobene, 709 F.2d at 223. This attribute may be satisfied even though individuals leave the

41

group and new members join at a different time.  Id.  Each
associate of the alleged enterprise must, however, perform a role
in the group consistent with the organizational structure
established by the first attribute and which furthers the
activities of the organization.  Id.

          In the present case, the defendants argue that the
plaintiffs' association-in-fact is too nebulous and imprecise to
constitute an enterprise.  According to the defendants, the
plaintiffs' use of the term "group" is simply an artful pleading
device for artificially combining unrelated individuals and that
RICO does not permit the "grouping" of "groups" without
consideration of whether all the individuals or entities within
the "group" are actually associated in fact.

          The Court agrees with the defendants that the
plaintiffs may not manufacture a RICO enterprise by using the
term "group," but it finds that the plaintiffs have alleged facts
that are sufficient to show that the various associates of the
alleged enterprise functioned as a continuing unit.  Stripped of
their "group" nomenclature, the associates of the alleged
association-in-fact consist of several related corporations that
engaged in various aspects of the insurance industry, their sales
agents, and the attorneys who helped the sales agents to sell the
insurance companies' annuities.  (Stein ¶¶ 6-10; Gilmour ¶¶ 8-36;
Trimble ¶¶ 13-32; Treitz ¶¶ 17-36).  Although the sales agents
and attorneys involved in each annuity sale were not identical,

42

their roles in the organizational structure of the alleged enterprise remained the same.  (Stein ¶¶ 14-25, 233; Gilmour ¶¶ 174-81; Trimble ¶¶ 147-54; Treitz ¶¶ 170-77).  Indeed, the plaintiffs allege that the sales scheme only worked if these sales agents and attorneys played the exact roles and followed the specific instructions set forth in the insurance companies' standardized marketing materials and sales presentations.  (Stein ¶¶ 257-58; Gilmour ¶ 204; Trimble ¶ 177; Treitz ¶ 200).  The Court accordingly finds that the plaintiffs have adequately pled the second essential attribute of a RICO enterprise.

### (3)   Existence Separate and Apart from Alleged Racketeering Activity

        The third essential attribute of a RICO enterprise is that the organization constitute an entity that is separate and apart from the pattern of activity in which it engages.  Riccobene, 709 F.2d at 223.  This last attribute does not require a plaintiff to allege that the enterprise has some function wholly unrelated to the racketeering activity, but rather that it has an existence beyond that which is necessary to commit the predicate racketeering offenses.  Id. at 223-24.  In Town of Kearny v. Hudson Meadows Urban Renewal Corp., 829 F.2d 1263 (3d Cir. 1987), the United States Court of Appeals for the Third Circuit found that the separate existence requirement was satisfied where persons associated with the enterprise engaged in two separate but similar schemes.  Id. at 1266.

43

In the present case, the defendants argue that the plaintiffs' allegations do not satisfy the "separateness" attribute of a RICO enterprise because the plaintiffs fail to allege that the association-in-fact itself existed separate and apart from the pattern of racketeering activity at issue in the litigation.  According to the defendants, the plaintiffs plead only that the individual members of the association-in-fact were separate and apart from the alleged racketeering activity.

The Court finds that the plaintiffs have sufficiently pled the "separateness" attribute of a RICO enterprise.  The plaintiffs allege that the members of the association-in-fact engage in other activities besides those at issue in this complaint, including selling annuities to persons not similarly situated to the plaintiffs, selling insurance products other than annuities, and providing financial planning and retirement planning to persons other than the plaintiffs.  (Stein ¶ 247; Gilmour ¶ 190; Trimble ¶ 163; Treitz ¶ 186).  Although this allegation is ambiguous as to whether it refers to the individual members of the enterprise or to the enterprise as a whole, at this stage of the litigation, the Court is obligated to construe the allegations in the light most favorable to the plaintiff.  H.J., 492 U.S. at 249.  The Court therefore reads this allegation as stating that the association-in-fact worked together to engage in activities other than those at issue in the complaints.

44

Such a construction is consistent with the plaintiffs'
other allegation that the various elements of the association-in-
fact function as a continuing unit to commit the scheme at issue,
as well as to earn money by providing financial planning and
investments to persons other than those who are similarly
situated to the plaintiffs.  (Stein ¶ 246; Gilmour ¶ 189; Trimble
¶ 162; Treitz ¶ 185).  The Court accordingly finds that the
plaintiffs have adequately pled the third and final essential
attribute of a RICO enterprise.

b.   Conduct or Participation

A plaintiff bringing a section 1962(c) claim must not
only show that an enterprise exists, but that each defendant
conducted or participated in the conduct of the enterprise's
affairs.[9]  The Supreme Court has interpreted the "conduct or

---

[9]   Courts have also required section 1962(c) plaintiffs to show
that the defendant is distinct from the alleged enterprise.  This
requirement stems from the statute's language that the "person"
sued must be "employed by or associated with" an enterprise.
Because an enterprise cannot logically employ or associate with
itself, the defendant must be distinct from the alleged
enterprise.  Brittingham v. Mobil Corp., 943 F.2d 297, 300 (3d
Cir. 1991) (citing B.F. Hirsch v. Enright Ref. Co., 751 F.2d 628,
633-634 (3d Cir. 1984)).

When a defendant is a corporation, the alleged enterprise
"must be more than an association of individuals or entities
conducting the normal affairs" of that corporation.  Brittingham,
943 F.2d at 301.  In Brittingham, the plaintiffs brought a
section 1962(c) claim against Mobil Oil Corporation and its
subsidiary for misrepresenting the degradable qualities of a line
of trash bags.  Id. at 299.  The plaintiffs alleged an
association-in-fact enterprise consisting of Mobil, its
subsidiary, and the advertising agencies that they had hired to

participation" element to require a plaintiff to allege that a
defendant participated in the operation or management of the
enterprise itself.  <u>Reves v. Ernst & Young</u>, 507 U.S. 170, 185
(1991); <u>see also</u> <u>Univ. of Md. at Balt. v. Peat, Marwick, Main &
Co.</u>, 996 F.2d 1534, 1539 (3d Cir. 1993) (applying <u>Reves</u> in a
motion to dismiss context).

---

promote the trash bags.  <u>Id.</u> at 300.  Following court-ordered
discovery on the limited issue of whether the plaintiffs could
demonstrate facts sufficient to sustain the RICO claim, the
district court granted the defendants' motion for summary
judgment on the ground that the alleged enterprise was not
sufficiently distinct from the defendants.  <u>Id.</u> at 300.

    The Court of Appeals affirmed, reasoning that a corporation
must always act through its employees, agents, or affiliated
entities acting on its behalf.  <u>Id.</u> at 301.  Because the
plaintiffs had produced no evidence indicating that the defendant
corporations took a distinctive role in the alleged racketeering
activity, the court concluded that summary judgment was
appropriate.  <u>Id.</u> at 303.  The court reached this decision
despite the plaintiffs' inclusion of Mobil's advertising agencies
in the alleged enterprise because "[t]he advertising agencies
were defendants' agents, and did no more than conduct the affairs
of the defendant corporations."  <u>Id.</u>

    At various places in their pending motion, the Insurance
Company Group defendants suggest that the allegations of two of
the named plaintiffs in the <u>Stein</u> complaint -- the Inferreras and
Edwards -- fail the person-enterprise distinction because they do
not allege that a lawyer participated in their purchase of an
annuity.  Without the participation of a lawyer, these defendants
argue, such plaintiffs allege an enterprise that consists of
nothing more than an association of the Insurance Company Group's
agents and affiliated entities conducting the normal affairs of
the defendant corporations.

    The Court will not decide this issue because it concludes
below that these plaintiffs do not allege any predicate acts of
racketeering activity.  The Court, therefore, will dismiss the
RICO claims of these plaintiffs on that ground.

To conduct or participate in the conduct of an enterprise's affairs, a defendant must "have some part in directing those affairs."  Reves, 507 U.S. at 179.  The defendant need not, however, hold a formal position within an enterprise to "participate" in its affairs.  United States v. Parise, 159 F.3d 790, 796 (3d Cir. 1998).  Indeed, the "conduct or participation" requirement "does not limit RICO liability to upper management because 'an enterprise is operated not just by upper management but also by lower-rung participants in the enterprise who are under the direction of upper management.'"  Id. (quoting Reves, 507 U.S. at 184 (internal quotation marks omitted)).  RICO liability may therefore extend to those who knowingly further the illegal aims of the enterprise by carrying out the directives of those in control.  United States v. Urban, 404 F.3d 754, 769-70 (3d Cir. 2005).  In applying Reves, the United States Court of Appeals for the Third Circuit has stated that RICO liability will apply where there is "a nexus between the person and the conduct in the affairs of an enterprise."  Id. at 770.

In the present case, attorneys Weinstein and Plaza argue that the plaintiffs in Trimble and Treitz fail to allege that Weinstein or Plaza participated in the operation or management of the enterprise because these two attorneys did not participate in the sale of annuities or legal services. According to these defendants, the plaintiffs allege that they retained attorney Bohmueller, not Weinstein or Plaza, in

47

connection with their purchase of living trusts.  Bohmueller therefore is the only attorney who could have participated in the allegedly fraudulent scheme.

The Court concludes that the plaintiffs in Trimble and Treitz have adequately pled that attorneys Weinstein and Plaza participated in the operation or management of the alleged enterprise.  The plaintiffs allege that Bohmueller, Weinstein, and Plaza acted in concert to provide legal services to the plaintiffs in connection with their purchase of annuities and other estate planning instruments.  (Trimble ¶ 31; Treitz ¶ 35). The plaintiffs further allege that Weinstein and Plaza did so with the knowledge that these services were being rendered in furtherance of the allegedly fraudulent sales scheme.  (Trimble ¶ 49; Treitz ¶ 59).  As explained above, this provision of legal services was integral to the allegedly fraudulent scheme, which was developed and overseen by members of the Insurance Company Group.  (Trimble ¶ 177; Treitz ¶ 200).  The plaintiffs in Trimble and Treitz have therefore adequately pled that Weinstein and Plaza "knowingly furthered the illegal aims of the enterprise by carrying out the directives of those in control," thereby demonstrating the requisite nexus between these defendants and the conduct of the affairs of the enterprise.  See Urban, 404 F.3d at 769-70.

c.   Racketeering Activity

To state a claim under § 1962(c), a plaintiff must allege that the defendant conducted the alleged enterprise through a "pattern of racketeering activity."  See Sedima, 473 U.S. at 496.  A "pattern of racketeering activity" is defined as the commission of at least two of the predicate offenses listed in 18 U.S.C. § 1961(1) within a ten-year period.  18 U.S.C. § 1961(5).  In the present case, the plaintiffs allege that the defendants engaged in a pattern of mail and wire fraud, which are among the "racketeering activities" enumerated in § 1961(1).  18 U.S.C. § 1961(1).

The federal mail and wire fraud statutes prohibit the use of the mail or interstate wires for purposes of carrying out any scheme or artifice to defraud.[10]  See 18 U.S.C. §§ 1341, 1343; see also Annulli v. Panikkar, 200 F.3d 189, 200 n.9 (3d Cir. 1999).  To state a claim for mail or wire fraud, a plaintiff must therefore allege (i) a scheme to defraud, and (ii) use of the mails or interstate wires in furtherance thereof.  See United States v. Pharis, 298 F.3d 228, 234 (3d Cir. 2002).

---

[10]    The mail fraud statute, 18 U.S.C. § 1341, makes it a crime to mail or cause to be delivered by mail any matter or thing for the purpose of executing, or attempting to execute, any scheme or artifice to defraud.  The wire fraud statute, 18 U.S.C. § 1343, makes it a crime to transmit or cause to be transmitted any communication by wire, radio, or television in interstate or foreign commerce for the purpose of executing any scheme or artifice to defraud.  Thus, the statutes cover in-state mailings, but not in-state telephone calls.  Annulli v. Panikkar, 200 F.3d 189, 200 n.9 (3d Cir. 1999).

Furthermore, where, as here, a plaintiff relies on the federal mail and wire fraud statutes as the basis for the alleged RICO violation, the plaintiff's allegations must comply with Federal Rule of Civil Procedure 9(b).  <u>Lum</u>, 361 F.3d at 223; Fed. R. Civ. P. 9(b).  Rule 9(b) requires a plaintiff to plead fraud with particularity sufficient to place the defendants on notice of the precise misconduct with which they are charged, and to protect defendants from spurious charges of fraudulent behavior.  <u>Seville Indus. Mach. Corp. v. Southmost Mach. Corp.</u>, 742 F.2d 786, 791 (3d Cir. 1984).  Allegations of date, place, and time are adequate to satisfy the Rule, but nothing in the Rule requires such specificity.  <u>Id.</u>  Instead, plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud.  <u>Id.</u>  Until a class is certified, a court must judge the adequacy of the fraud allegations solely by reference to the allegations relating to the named plaintiffs.  <u>Lum</u>, 361 F.3d at 225 (citing <u>Rolo v. City Investing Co. Liquidating Trust</u>, 155 F.3d 644, 659 (3d Cir. 1998)).

In the present case, the defendants argue that the plaintiffs have failed to plead a pattern of racketeering activity because (i) the plaintiffs' allegations do not allege a scheme to defraud, and (ii) the plaintiffs have failed to allege with sufficient particularity the defendants' use of the mail or interstate wires in furtherance thereof.

50

(1)   <u>Scheme to Defraud</u>

A scheme to defraud "need not be fraudulent on its face but must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." <u>United States v. Coyle</u>, 63 F.3d 1239, 1243 (3d Cir. 1995).  Noting that the federal mail and wire fraud statutes have been "expansively construed," the United States Court of Appeals for the Third Circuit has stated that the scheme need not involve affirmative misrepresentations.  <u>Kehr Packages, Inc. v. Fidelcor, Inc.</u>, 926 F.2d 1406, 1415-16 (3d Cir. 1991).  The court has stated, however, that the statutory term "defraud" usually entails the deprivation of something of value by "trick, deceit, chicane or overreaching."  <u>Id.</u>

In the present case, the defendants make two arguments as to why the plaintiffs have failed to plead a scheme to defraud.[11]  First, the defendants argue that there was no fraud because the alleged misrepresentations or omissions of material fact regarding the characteristics of the annuities were

---

[11]   The defendants also argue that the Inferreras, Ryles, and Edwards, in particular, fail to plead the scheme to defraud with sufficient particularity because their allegations are too vague to permit the Court to discern what alleged misrepresentations and omissions were made to these plaintiffs in connection with their annuity purchases.  The Court will not decide this issue because it concludes below that these plaintiffs do not allege any use of the mails or interstate wires in connection with their purchase of the Insurance Company Group's annuities.  The Court, therefore, will dismiss the RICO claims of these plaintiffs on that ground.

contradicted or disclosed in the annuity contracts themselves. And second, the defendants contend that the alleged misrepresentation about the annuities' "suitability" for the plaintiffs -- a misrepresentation that the plaintiffs contend lies at the heart of this case -- constitutes a non-actionable matter of opinion, rather than a fraudulent misrepresentation of fact.  Because the Court finds that the plaintiffs have adequately pled a scheme to defraud regardless of whether "suitability" is a misrepresentation of fact or a matter of opinion, the Court will deny the plaintiffs' motion to dismiss without addressing the "suitability" issue.[12]

Contrary to the defendants' contention, the plaintiffs in the present litigation have adequately pleaded a scheme to defraud despite the fact that many of the alleged misrepresentations and omissions were contradicted or disclosed in the annuity contracts themselves.  According to the plaintiffs, the scheme called for Sales Group members to gain the trust of senior citizens by affirmatively misrepresenting themselves as objective estate planning advisers, rather than

---

[12]    During oral argument on the motions to dismiss, the plaintiffs' lead counsel asked the Court to ignore the plaintiffs' allegation that the defendants misrepresented the suitability of the annuities in deciding whether the plaintiffs had stated a claim under RICO.  The plaintiffs do intend to rely on this allegation when moving for class certification.  The plaintiffs' lead counsel asked the Court to refrain from any decision on whether representations about the suitability of the annuities constitutes fraud until then.  Tr. at 89-91.

commissioned salespeople.  (<u>Stein</u> ¶¶ 14-17; <u>Gilmour</u> ¶¶ 174-78;
<u>Trimble</u> ¶¶ 147-51; <u>Treitz</u> ¶¶ 170-74).  Having gained the trust of
senior citizens, often through visits to their homes, the Sales
Group members then allegedly misrepresented the benefits of
living trusts in order to convince senior citizens to purchase
the estate planning instruments.  According to the plaintiffs,
instead of minimizing taxes and avoiding probate, the living
trusts did nothing more than offer the salespeople a convenient
way of identifying assets that could be used to purchase the
Insurance Company Group's annuities.  (<u>Stein</u> ¶¶ 251-58; <u>Gilmour</u>
¶¶ 196-202; <u>Trimble</u> ¶¶ 171-77; <u>Treitz</u> ¶¶ 194-200).

Once the trust of these senior citizens was gained and
the available assets were identified, the Sales Group members
would then recommend that the senior citizens purchase one or
more of the Insurance Company Group's annuities.  (<u>Stein</u> ¶¶ 254-
58; <u>Gilmour</u> ¶¶ 199-203; <u>Trimble</u> ¶¶ 172-76; <u>Treitz</u> ¶¶ 195-99).  In
the course of selling the annuities, the Sales Group members were
instructed to omit certain facts relating to the annuities,
including (i) that they were deferred (<u>i.e.</u>, that the receipt of
monthly payments would be deferred), (ii) how long they would be
deferred, and (iii) the existence of surrender charges for early
capital withdrawals.  (<u>Stein</u> ¶¶ 14, 254, 259; <u>Gilmour</u> ¶¶ 1, 2,
43; <u>Trimble</u> ¶¶ 2-6; <u>Treitz</u> ¶¶ 2-7).  These omissions were
allegedly material because the annuities had deferral periods
that often extended into the plaintiffs' nineties or beyond.

(Stein ¶¶ 108, 145, 165, 181, 193, 202-03, 206, 212; Gilmour ¶ 163; Trimble ¶ 92; Treitz ¶ 106).

The Court finds that such a scheme involved misrepresentations and omissions that are reasonably calculated to deceive persons of ordinary prudence and comprehension. See Coyle, 63 F.3d at 1243. Simply having the plaintiffs sign annuity contracts that contradict or disclose these alleged misrepresentations is not enough to change that conclusion.

Indeed, the two district court cases that the defendants cite to substantiate their argument that the annuity contracts cured the effect of the Sales Group's omissions and misrepresentations are not on point. See Warden v. Crown Am. Realty Trust, No. 96-25J, 1999 WL 476996 (W.D. Pa. July 6, 1999); see also Knez Optical, Inc. v. Singer Optical Group, Inc., No. 94-7582, 1995 WL 649262 (E.D. Pa. Nov. 3, 1995). Warden was a purported securities fraud class action where the court dismissed a claim brought under section 10(b) of the Exchange Act because the plaintiffs had failed to plead reasonable and justifiable reliance. Warden, 1999 WL 476996, at *1. Such reasoning is inapplicable to the case at hand because the Supreme Court has specifically stated that justifiable reliance is not an element of the federal mail or wire fraud statutes. Neder v. United States, 527 U.S. 1, 24-25 (1999).

Knez is likewise inapplicable because it involves an application of the parol evidence rule. Knez, 1995 WL 649262, at

*4-*6.  There, the district court dismissed the plaintiff's RICO claims based on federal mail and wire fraud because the parol evidence rule barred the court from considering the alleged oral misrepresentations at issue.  Id.  In the present litigation, the defendants do not argue that the parol evidence rule bars the court from considering the alleged misrepresentations and omissions made by members of the Sales Group members.

The Court accordingly finds that the plaintiffs have adequately pleaded a scheme to defraud for purposes of the federal mail and wire fraud statutes.

### (2)  Use of the Mails or Wires

To state a claim for federal mail or wire fraud, a plaintiff must also allege that the defendant used the mails or interstate wires in furtherance of the scheme to defraud.  See Pharis, 298 F.3d at 234.  Detailed allegations regarding the fraudulent scheme overall are not a substitute for detailed allegations about the acts of mail or wire fraud.[13]  See Warden v.

---

[13]    In Rolo, 155 F.3d 644, the plaintiffs made "quite detailed" allegations regarding the fraudulent scheme and described the contents of the mailings in "reasonably specific terms."  Id. at 658.  The court held, nevertheless, that the plaintiffs failed to plead mail fraud with particularity because the complaint did not specify "when, by whom, and to whom a mailing was sent, and the precise content of each particular mailing."  Id. at 659. Similarly, in Warden v. McLelland, 288 F.3d 105 (3d Cir. 2002), the complaint provided a "reasonably clear overall picture of what had been alleged," but did "not state clearly how [the communications alleged to constitute wire fraud] were false or misleading or how they contributed to the alleged fraudulent scheme."  Id. at 114.  The Court of Appeals instructed the

McLelland, 288 F.3d 105, 114 (3d Cir. 2002); Rolo, 155 F.3d at 658-659.  Mailings and wire communications do not have to be fraudulent in and of themselves to come within the mail and wire fraud statutes.  Schmuck v. United States, 489 U.S. 705, 715 (1989).  They do not even have to be an essential part of the fraudulent scheme; they only need to be "incident to an essential part of the scheme."  Id. at 709-10.  Use of the mails or wires even after money has been obtained through allegedly fraudulent means may come within the statute if it serves to lull the alleged victim into a false sense of security and prevent detection.  United States v. Sampson, 371 U.S. 75, 81 (1962).

        The defendant does not have to send the mailing or wire communication personally.  A defendant may be liable where he or she acts "with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended."  Pereira v. United States, 347 U.S. 1, 8-9 (1954); United States v. Bentz, 21 F.3d 37, 40 (3d Cir. 1994).

        From these cases, the Court discerns the following principle:  to properly allege that a defendant committed an act of mail or wire fraud, a plaintiff must allege facts from which the Court can infer (i) that the defendant used the mails or interstate wires as part of a scheme to defraud, or (ii) that the

---

district court to re-examine the complaint and permit the plaintiffs to amend if appropriate.  Id.

mails or interstate wires were used, and that the defendants took some action whereby such use was reasonably foreseeable.  Many of the moving defendants argue that the allegations of certain plaintiffs fail to comply with this requirement.  The Court will examine each of these defendants' arguments in turn.

(a)   <u>The Insurance Company Group Defendants</u>

The Insurance Company Group defendants -- AAG, AILIC, CMIC, IAMS, and AISG -- argue that the allegations of the Steins, Inferreras, Gilmours, Trimbles, Brennans (Treitz), Lynch, Ryles, Miller, and Edwards are deficient because these plaintiffs either (i) fail to allege any use of the mails or interstate wires at all, or (ii) fail to plead such use with particularity as required by Rule 9(b).  The Court agrees with the Insurance Company Group's contention that the Inferreras, Ryles, Miller, and Edwards have failed to adequately plead mail or wire fraud. The Court finds, however, that the rest of the above-mentioned plaintiffs have pled the requisite two predicate acts of mail and wire fraud against the insurance companies.

According to the complaints, the Insurance Company Group directed the affairs of the alleged association-in-fact, which operated, at least in part, to execute an allegedly fraudulent scheme to sell senior citizens unnecessary and unsuitable estate planning instruments and annuities.  (<u>Stein</u> ¶¶ 247, 259; <u>Gilmour</u> ¶¶ 191, 205; <u>Trimble</u> ¶¶ 164, 178; <u>Treitz</u> ¶¶

187, 201).  The complaints describe, in varying detail, how this scheme allegedly induced each plaintiff to purchase one or more of the Insurance Company Group's annuities.  (<u>Stein</u> ¶¶ 98-218; <u>Gilmour</u> ¶¶ 117-71; <u>Trimble</u> ¶¶ 82-144; <u>Treitz</u> ¶¶ 92-167).  Within these pleadings, the Steins, Gilmours, Trimbles, Brennans (Treitz), and Lynch each identify at least two separate, specific uses of the mails or wires that were incident to an essential element of this scheme (<u>i.e.</u>, the sale of the Insurance Company Group's annuities).[14]  (<u>Id.</u>)  This use of the mails and interstate wires was a reasonably foreseeable consequence of the Insurance Company Group's alleged conduct.  These plaintiff's allegations

---

[14]    The Steins: (i) Larson's May 2002 mailing of the Steins' application to purchase an AILIC annuity to AmerUs; and (ii) AmerUs' December 2002 letter to the Steins regarding the financial performance of AILIC and the valuation of the Steins' annuity.  (<u>Stein</u> ¶¶ 107, 114).

   Lynch: (i) AmerUs' April 2003 mailing of a policy amendment to Lynch; (ii) AmerUs' January 2004 letter to Lynch relating to her AILIC annuity and the rates at which it could be renewed; and (iii) AILIC and AAG's January and March 2005 letters to Lynch regarding certain aspects of her annuity.  (<u>Stein</u> ¶¶ 130, 134, 271).

   The Gilmours: (i) AILIC's mailing of the Gilmours' annuity policies to Mr. Strope or Horowitz; and (ii) Mr. Strope or Horowitz's mailing of the signed annuity policies back to AILIC.  (<u>Gilmour</u> ¶ 224).

   The Trimbles: (i) AILIC's mailing of the Trimbles' annuity policy to Spangler; and (ii) Spangler's mailing of the signed annuity policy back to AILIC.  (<u>Trimble</u> ¶ 194).

   The Brennans: (i) AILIC's mailing of the Trimbles' annuity policy to Larson; and (ii) Larson's mailing of the signed annuity policy back to AILIC.  (<u>Treitz</u> ¶ 194).

of federal mail and wire fraud against the Insurance Company are therefore sufficient to withstand the instant motion to dismiss. See Schmuck, 489 U.S. at 715.

The allegations of the Inferreras, Ryles, Miller, and Edwards, however, fail to plead any predicate acts of mail or wire fraud.  The Inferreras, Ryles, and Edwards do not allege any use of the mails or interstate wires at all in connection with their purchase of the Insurance Company Group's annuities. (Stein ¶¶ 174-82, 201-09).  And although Miller does allege the use of the mail or interstate wires in connection with his purchase of an annuity, this use appears to relate to his purchase of an annuity from American Equity, a corporation that is neither a defendant in this litigation nor related in any way to the Insurance Company Group defendants.  (Stein ¶¶ 183-200). The Court will accordingly dismiss these plaintiffs' RICO claims.

### (b)   Bohmueller

Bohmueller argues that the plaintiffs in the Gilmour, Trimble, and Treitz actions have failed to adequately plead that he used the mails or interstate wires in furtherance of the alleged scheme to defraud.  According to Bohmueller, these plaintiffs either do not allege that the attorney used the mails or interstate wires at all, or they fail to explain how the attorney's use of the mails or interstate wires furthered the allegedly fraudulent scheme.

According to the complaints, Bohmueller participated in the allegedly fraudulent scheme to sell the Insurance Company Group's annuities by, among other things, knowingly allowing Sales Group members to use the living-trust creation process as a way of identifying assets that could be used to purchase annuities. (<u>Gilmour</u> ¶¶ 196-201; <u>Trimble</u> ¶¶ 169-74; <u>Treitz</u> ¶¶ 192-97). Bohmueller's involvement in the scheme as it relates to the plaintiffs in <u>Gilmour</u>, <u>Trimble</u>, and <u>Treitz</u> is evidenced by the alleged fact that these plaintiffs all purchased living trusts by checks made payable to "Bohmueller Law Offices." (<u>Gilmour</u> ¶ 129; <u>Trimble</u> ¶ 93; <u>Treitz</u> ¶ 101). These plaintiffs have each identified at least two separate, specific uses of the mails or wires that were incident to their purchase of the Insurance Company Group's annuities (an essential element of the scheme to defraud).[15] These uses of the mails or interstate wires were a reasonably foreseeable consequence of Bohmueller's actions, which helped facilitate the allegedly fraudulent annuity sales. These plaintiffs' allegations of federal mail and wire fraud against

---

[15]    The Gilmours: (i) AILIC's mailing of the Gilmours' annuity policies to Mr. Strope or Horowitz; and (ii) Mr. Strope or Horowitz's mailing of the signed annuity policies back to AILIC. (<u>Gilmour</u> ¶ 224).

The Trimbles: (i) AILIC's mailing of the Trimbles' annuity policy to Spangler; and (ii) Spangler's mailing of the signed annuity policy back to AILIC.  (<u>Trimble</u> ¶ 194).

The Brennans: (i) AILIC's mailing of the Trimbles' annuity policy to Larson; and (ii) Larson's mailing of the signed annuity policy back to AILIC.  (<u>Treitz</u> ¶ 194).

Bohmueller are therefore sufficient to withstand his motion to dismiss.

(c)  <u>Weinstein and Plaza</u>

Attorney defendants Weinstein and Plaza argue that the plaintiffs in <u>Trimble</u> and <u>Treitz</u> have failed to allege that either attorney committed the requisite predicate acts of mail or wire fraud.  Weinstein contends that the allegations of mail and wire fraud in <u>Trimble</u> are too vague to satisfy the requirements of Rule 9(b), and both Weinstein and Plaza argue that the allegations in <u>Treitz</u> are deficient because (i) they are too vague, and (ii) they refer to the conduct of attorney Bohmueller, not the conduct of Weinstein or Plaza.

The plaintiff in <u>Trimble</u> alleges that Weinstein was partners with Bohmueller and acted in concert with Bohmueller to provide the Trimbles with legal services, including the preparation of the Trimbles' living trust.  (<u>Trimble</u> ¶¶ 29-32). The plaintiff in <u>Treitz</u> likewise alleges that Weinstein and Plaza acted in concert with Bohmueller to provide legal services to the Brennans, including the preparation of the Brennans' living trust.  (<u>Treitz</u> ¶¶ 31-36).  As explained above, it was reasonably foreseeable that this conduct in furtherance of the alleged scheme to defraud would lead to the use of the mails or interstate wires.  The plaintiffs in <u>Treitz</u> and <u>Trimble</u> have

therefore adequately alleged that Weinstein and Plaza committed the requisite acts of mail or wire fraud.

(d)   The Patriot Group

The Patriot Group argues that the plaintiff in Gilmour has failed to adequately plead that the Patriot Group committed the requisite predicate acts of federal mail or wire fraud. According to this defendant, the Gilmour plaintiff's allegations of mail and wire fraud (i) are too vague to satisfy Rule 9(b), and (ii) fail to specify how the Patriot Group's use of the mails or interstate wires furthered the alleged scheme to defraud.

The plaintiff in Gilmour has alleged numerous specific instances of the Patriot Group's use of the mail or interstate wires in furtherance of the alleged scheme to defraud.  For example, the plaintiff alleges that in May of 2001, the Patriot Group, through its sales agent Mr. Strope, mailed the Gilmours' AILIC annuity applications from the Patriot Group's Pennsylvania office to AILIC's Kansas office.  (Gilmour Amended RICO Case Statement No. 4(ff)(1)).  The plaintiff also alleges that on June 29, 2001, the Patriot Group, through Mr. Strope, mailed the Gilmours' signed policy delivery receipt from the Patriot Group's Pennsylvania office to AILIC.  (Gilmour Amended RICO Case Statement No. 4(ff)(21)).  Although these mailings are not fraudulent in and of themselves, they were done incident to an essential part of the scheme (i.e., the sale of the Insurance

62

Company Group's annuities).  The Court therefore finds that the plaintiff in <u>Gilmour</u> has alleged that the Patriot Group participated in the requisite predicate acts of mail or wire fraud.  <u>See</u> <u>Schmuck</u>, 489 U.S. at 709-10, 715.

(3)   <u>Injury to Business or Property</u>

A plaintiff has standing to bring a RICO claim if, and can recover only to the extent that, he has been injured in his business or property by the conduct constituting the violation. <u>Sedima</u>, 473 U.S. at 496.  As explained by the United States Court of Appeals for the Third Circuit, this "injury to business or property" element of a RICO claim requires the plaintiff to plead a concrete financial loss and not mere injury to a valuable, intangible property interest.  <u>See</u> <u>Maio v. Aetna, Inc.</u>, 221 F.3d 472, 483 (3d Cir. 2000).

The defendants argue that the plaintiffs lack standing to bring a RICO claim because they have failed to allege any concrete financial loss.  According to the defendants, the plaintiffs' alleged injury -- that they were fraudulently induced to purchase annuities whose undisclosed deferral periods and surrender charges tied up their money and deprived them of current income -- is not the type of concrete financial loss that RICO's standing requirement demands.

As a preliminary matter, this argument ignores the alleged fact that most of the plaintiffs were fraudulently

63

induced to purchase living trusts for which they had no actual use.  This payment of between $600 and $2,000 for a useless estate planning instrument constitutes the type of actual monetary loss that is sufficient to satisfy RICO's injury requirement.  See Maio, 221 F.3d at 483-84.  By virtue of this allegation alone, the Steins, Prices, Gilmours, Trimbles, Brennans (Treitz), Lynch, Healy, Ryles, and Miller have standing to bring RICO claims.  (Stein ¶¶ 105, 125, 140, 163, 179, 191, 259; Gilmour ¶¶ 129, 205; Trimble ¶¶ 93, 178; Treitz ¶¶ 101, 201).

More importantly, the plaintiffs' allegation that they were fraudulently induced to purchase annuities that had undisclosed deferral periods and surrender charges does, in fact, constitute the type of concrete financial loss that is sufficient to confer standing under RICO.

In Maio, the plaintiffs alleged that the defendant, Aetna, engaged in a fraudulent scheme to induce individuals to purchase their health insurance by, among other things, representing that its insureds would receive "high quality" health care from physicians. Maio, 221 F.3d at 474-78.  In reality, Aetna's internal policies restricted the physicians' ability to provide the health care that the plaintiffs were promised.  Id. at 474-79.  The plaintiffs claimed that their injury consisted of the difference in value between the "high quality" health insurance promised and the "inferior" health

insurance actually received.  Id. at 486.  The plaintiffs did not allege that they suffered any personal injuries, were denied necessary benefits, or received inferior care.  Id. at 485.  According to the plaintiffs, their financial loss was not dependant upon individualized allegations concerning the level or adequacy of the care that each plaintiff received under Aetna's plan.  Id. at 487.  Rather, the plaintiffs' injury consisted solely of the financial losses that they incurred by paying too much for their enrollment in Aetna's "inferior" health plan.  Id. at 485.

The Court of Appeals rejected this theory, holding that the plaintiffs could not establish that they suffered a tangible economic harm compensable under RICO.  Id. at 488.  According to the court, absent allegations that Aetna failed to provide sufficient health insurance coverage in the sense that their insureds received inadequate, inferior, or delayed medical treatment, there was no factual basis for the plaintiffs' allegation that they had been injured in their "property" because the health insurance they received was inferior, and therefore worth less, than what they paid for it.  Id.

The Court reached this conclusion because the plaintiffs' property interest in their health insurance coverage took the form of a contractual right to receive a certain level of benefits from Aetna.  Id. at 490.  The contours of this contractual right was defined by the parties' contractual

agreement as well as Aetna's extra-contractual promise to provide "high quality" health care. <u>Id.</u> at 491. It inexorably followed, the court reasoned, that the plaintiffs could not establish a RICO injury absent proof that Aetna failed to perform under the parties' arrangement. <u>Id.</u> at 490.

In the present case, the plaintiffs allege that they were injured in connection with their purchase of the Insurance Company Group's annuities. (<u>Stein</u> ¶ 273, <u>Gilmour</u> ¶ 228; <u>Trimble</u> ¶ 198; <u>Treitz</u> ¶ 221). These annuities, like the health insurance policies in <u>Maio</u>, took the form of contractual rights to receive certain benefits. (<u>Stein</u> ¶ 62). To establish a RICO injury, the plaintiffs must therefore allege that the defendants failed to perform under the parties' arrangement. <u>Maio</u>, 221 F.3d at 490. The plaintiffs have alleged such a failure to perform.

According to the complaints, the Sales Group members induced the plaintiffs to purchase the annuities without disclosing that the annuities contained deferral periods and surrender charges. (<u>Stein</u> ¶¶ 109, 127-28, 146-47, 149-50, 166, 174, 183, 193-94, 205-06, 216-17; <u>Gilmour</u> ¶ 134; <u>Trimble</u> ¶ 95; <u>Treitz</u> ¶ 107). The plaintiffs' injury therefore consists of the difference in value between the annuities that they were promised (those without deferral periods and surrender charges) and the annuities that they actually received (those with deferral periods and surrender charges).

Although this damages theory appears similar to that which was posited by the plaintiffs in <u>Maio</u>, it contains one critical difference.  In <u>Maio</u>, the contracts at issue were for the provision of "high quality" health care services.  <u>Maio</u>, 221 F.3d at 485.  According to the court, the plaintiffs failed to plead a RICO injury because the plaintiffs did not allege that they had actually received health care that was inferior to that which they were promised.  <u>Id.</u> at 488.  Here, on the other hand, the contracts at issue were for the right to collect future payments, as well as the right to convert their contracts back into cash.  (<u>Stein</u> ¶¶ 62-67).  These rights were impaired by the undisclosed deferral periods and surrender charges.  The plaintiffs in the present litigation have alleged that they actually received less than what they were promised.

The plaintiffs therefore have standing under RICO and may recover to the extent that they were harmed by the undisclosed deferral periods and surrender charges.  <u>Sedima</u>, 473 U.S. at 496.

2.   <u>Claim Under Section 1962(d)</u>

The defendants argue that the plaintiffs' RICO conspiracy claim under 18 U.S.C. § 1962(d) should be dismissed because the plaintiffs have failed to plead an underlying violation of section 1962(c).

To state a RICO conspiracy claim under section 1962(d), a plaintiff must allege (i) an agreement to commit the predicate acts of fraud, and (ii) knowledge that those acts were part of a pattern of racketeering activity conducted in such a way as to violate section 1962(a), (b), or (c).  Rose v. Bartle, 871 F.2d 331, 366 (3d Cir. 1989).  A section 1962(d) claim cannot be pursued where there is no cognizable RICO enterprise or pattern of racketeering activity alleged by the defendant or co-conspirators.  See Lum, 361 F.3d at 227 n.5 ("Any claim under section 1962(d) based on conspiracy to violate the other subsections of section 1962 must fail if the substantive claims are themselves deficient.").

In the present case, the Court has dismissed the section 1962(c) claims of the Inferreras, Ryles, Miller, and Edwards because these plaintiffs have failed to plead the requisite pattern of racketeering activity.  The Court will accordingly dismiss their claims under 1962(d), as well.  Because the Court has concluded that the rest of the plaintiffs have stated valid RICO claims under section 1962(c), it will deny the defendants' motion to dismiss their RICO conspiracy claims.

3.   Whether the McCarron-Ferguson Act Bars the
     Plaintiffs' RICO Claims

The defendants argue that the McCarron-Ferguson Act, 15 U.S.C. §§ 1011, et seq., bars the plaintiffs' RICO claims insofar as these claims are based on allegations that the annuities are

per se unsuitable and fraudulently designed.  Because the Court

has declined to address the plaintiffs' allegations of per se

unsuitability in this opinion, the Court will not address this

argument.

C.    <u>State Law Claims</u>[16]

─────────────

[16]    Although neither the Supreme Court nor the United States
Court of Appeals for the Third Circuit has explicitly ruled on
the issue, it appears that in MDL proceedings the transferee
court applies the choice-of-law rules that would govern in the
transferor forum.  <u>Smith v. Waste Mgmt., Inc.</u>, 407 F.3d 381, 384
n.1 (5th Cir. 2005); <u>In re Rezulin Prod. Liab. Litig.</u>, 392 F.
Supp. 2d 597, 606 (S.D.N.Y. 2005); <u>In re Diet Drugs Prod. Liab.
Litig.</u>, MDL-1203, No. 03-20284, 2004 WL 1925010, at *1 (E.D. Pa.
Aug. 30, 2004).

    In this case, suits brought by the Inferreras and Edwards
were transferred to this Court from California and Florida,
respectively.  The Court must therefore apply the choice-of-law
rules from California and Florida to determine which state's laws
govern these claims.  In addition, the Court must look at
Pennsylvania's choice-of-law rules to determine which state's
laws govern the rest of the plaintiffs' claims, all of which are
contained in complaints that were originally filed in this Court.

    The Court finds that the choice-of-law rules of
Pennsylvania, Florida, and California all require application of
the laws of the jurisdictions where the transactions, misconduct,
and injuries allegedly occurred.  <u>See</u> <u>Huber v. Taylor</u>, 469 F.3d
67, 74-81 (3d Cir. 2006); <u>see also</u> <u>Trumpet Vine Inv., N.V. v.
Union Capital Partners I, Inc.</u>, 92 F.3d 1110, 1116 (11th Cir.
1996); <u>Waggoner v. Snow, Becker, Kroll, Klaris & Krauss</u>, 991 F.2d
1501, 1508 (9th Cir. 1993).  In this case, those states are
Pennsylvania, Florida, and California.

    Before a choice-of-law question arises, however, there must
first be a true conflict between the potentially applicable
bodies of law.  <u>Huber</u>, 469 F.3d at 74.  If there is no conflict,
then the district court may refer interchangeably to the laws of
the states whose laws potentially apply.  <u>Id.</u>  In the present
case, the parties do not argue, and the Court does not find, that
there is a true conflict between the laws of Pennsylvania,
Florida, and California with regard to breach of fiduciary duty,

1.   <u>Statute of Limitations</u>

The Insurance Company Group defendants, the EPAC defendants (EPAC, Larson, Mr. Strope, and Krygowski), and Bohmueller argue that many of the plaintiffs' tort claims against them are barred by Pennsylvania's two-year statute of limitations on such causes of action.  These plaintiffs respond by arguing that their tort claims are timely because the delayed discovery doctrine tolls the applicable statute of limitations.

Although ordinarily treated as an affirmative defense, failure to comply with the applicable statute of limitations may be raised on a motion to dismiss where the allegations made on the face of the complaint show that the cause of action is time-barred.  <u>Benak v. Alliance Capital Mgmt., L.P.</u>, 435 F.3d 396, 400 n.14 (3d Cir. 2006).  In Pennsylvania, tort claims are subject to a two-year statute of limitations.  42 Pa. Cons. Stat. § 5524(7) (2004).  This limitations period begins to run as soon as the right to institute and maintain a suit arises, which, as a general rule, is when the injury was inflicted.  <u>Drelles v. Mfrs.</u>

---

negligence, or unjust enrichment (the only state law claims alleged by the Inferreras and Edwards).  <u>See, e.g.</u>, <u>eToll, Inc. v. Elias/Savion Adver., Inc.</u>, 811 A.2d 10, 22 (Pa. Super. Ct. 2002) (discussing the requirements for the establishment of a fact-specific fiduciary duty); <u>City Solutions, Inc. v. Clear Channel Commc'ns, Inc.</u>, 201 F. Supp. 2d 1048, 1050 (N.D. Cal. 2002); <u>see also</u> <u>Lanz v. Resolution Trust Corp.</u>, 764 F. Supp. 176, 179 (S.D. Fla. 1991) (same);.

The Court will therefore refer to these states' laws interchangeably in addressing these claims.

Life Ins. Co., 881 A.2d 822, 831 (Pa. Super. Ct. 2005).  Mistake, misunderstanding, or lack of knowledge in themselves do not toll the running of the statute.  See Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc., 468 A.2d 468, 471 (Pa. 1983).

The delayed discovery doctrine is an exception to the general rule that a cause of action begins to run at the time of injury.  Id.  This doctrine excludes from consideration the time during which a party who has not suffered an immediately ascertainable injury remains "reasonably unaware" of the facts and circumstances surrounding his claim.  Drelles, 881 A.2d at 831.  The key point that gives rise to the doctrine's application is the inability of the injured party, despite the exercise of "reasonable diligence," to know that he has been injured and by what cause.  Id.  Although the test for "reasonable diligence" is objective, "[i]t is sufficiently flexible to take into account the differences between persons and their capacity to meet certain situations and the circumstances confronting them at the time in question."  Fine v. Checcio, 870 A.2d 850, 858 (Pa. 2005).  Because this inquiry is "fact-driven," the determination of whether an individual plaintiff has exercised "reasonable diligence" is ordinarily left to the jury.  See id.

In the present case, the Insurance Company Group defendants, the EPAC defendants (EPAC, Larson, Mr. Strope, and Krygowski), and Bohmueller argue that the statute of limitations on the plaintiffs' tort claims against them began running on the

71

date the plaintiffs purchased their annuities.  On that date,
each plaintiff received his or her annuity contract, which
allegedly contradicted or disclosed all the alleged
misrepresentations and omissions that induced the plaintiff to
purchase the annuities.  According to these defendants, the tort
claims of the Steins, Prices, Gilmours, Trimbles, Brennans
(Treitz), Lynch, and Healy should be dismissed because more than
two years elapsed between their annuity purchase and the date on
which they filed suit.

        The Court finds that the complaints, on their face, do
not show that these plaintiffs' claims are time-barred.  Although
more than two years passed between the date on which these
plaintiffs purchased their annuities (and therefore received
their annuity contracts) and the date on which they filed suit,
it is unclear whether these plaintiffs failed to exercise
"reasonable diligence" in apprising themselves of their claims.
The complaints allege that the Sales Group members gained these
plaintiffs' trust so that the plaintiffs would rely solely upon
their representations (and omissions) when deciding whether to
purchase an annuity.  (Stein ¶¶ 14-23; Gilmour ¶¶ 194-99; Trimble
¶¶ 167-73; Treitz ¶¶ 190-96).  Furthermore, the complaints allege
that even if these plaintiffs had tried to read the annuity
contract, the contracts themselves were so complex that they were
insufficient to apprise these plaintiffs of their claims.  (Stein
¶¶ 11, 69-71; Gilmour ¶ 165).

                          72

The Court therefore will not dismiss these plaintiffs'
tort claims on the ground that they are time-barred.

     2.   <u>Breach of Fiduciary Duty</u>

The Insurance Company defendants, EPAC defendants
(EPAC, Larson, Mr. Strope, and Krygowski), and Attorney Group
defendants (Bohmueller, Weinstein, and Plaza) argue that the
plaintiffs' claims against them for breach of fiduciary duty
should be dismissed because the plaintiffs have failed to plead
the existence of a fiduciary relationship.  The plaintiffs
respond by arguing that a fiduciary relationship arose from the
relationship of trust that the Sales Group members created in
connection with the allegedly fraudulent sales scheme.  The
plaintiffs further allege that any breach of this fiduciary
relationship is attributable to both the Insurance Company Group
defendants and the Attorney Group defendants because the
salespeople were acting on their behalf.

A fiduciary relationship may arise "where by virtue of
the respective strength and weakness of the parties, one has a
power to take advantage of or exercise undue influence over the
other."  <u>eToll, Inc. v. Elias/Savion Adver., Inc.</u>, 811 A.2d 10,
22 (Pa. Super. Ct. 2002).  The critical question in determining
whether such a relationship exists is whether the relationship
goes beyond mere reliance on superior skill and into a
relationship characterized by "overmastering influence" on one

side or "weakness, dependence, or trust, justifiably reposed," on the other.  Id. at 23 (citing Basile v. H & R Block, 777 A.2d 95, 101 (Pa. Super. Ct. 2001)).  Such a relationship may arise, for example, when one occupies toward another a position of adviser or counselor.  Basile, 777 A.2d at 102.  Individuals who purport to give business advice "may engender confidential relations if others, by virtue of their own weakness or inability, the adviser's pretense or expertise, or a combination of both, invest such a level of trust that they seek no other counsel."  Id.  Any breaches of this duty by an agent may be attributed to his principal, so long as the agent is acting within the scope of his agency.  See Aiello v. Ed Saxe Real Estate, Inc., 499 A.2d 282, 285 (Pa. 1985).

In the present case, the plaintiffs allege that the members of the Sales Group, acting on behalf of the Insurance Company Group and the Attorney Group, held themselves out at all times as experts in estate planning and as associates of lawyers. The sales agents further gained the trust of the defendants by conferring on themselves imaginary titles, such as "Certified Elder Adviser."  (Stein ¶¶ 14-23; Gilmour ¶¶ 194-200; Trimble ¶¶ 167-73; Treitz ¶¶ 190-96).  With their true identities cloaked, the Sales Group members then conducted informational presentations, often followed by in-home visits, where the salespeople ostensibly offered the plaintiffs disinterested financial advice.  (Id.)  At these presentations and in-home

visits, the Sales Group members recommended that the plaintiffs,
all of whom were senior citizens, use any available assets to
purchase annuities.  (Stein ¶¶ 108, 145, 165, 181, 193, 202-03,
206, 212, 254-58; Gilmour ¶¶ 163, 199-203; Trimble ¶¶ 92, 172-76;
Treitz ¶¶ 106, 195-99).  The Court finds that these allegations
are sufficient to plead the existence of a fiduciary
relationship.

    3. Negligent Supervision

    The Insurance Company Group defendants, Weinstein, and
Plaza argue that the plaintiffs' claims against them for
negligent supervision should be dismissed because (i) the
plaintiffs have failed to plead the elements of a negligent
supervision claim, (ii) the plaintiffs cannot predicate a
negligence claim on suitability, and (iii) the economic loss
doctrine bars the plaintiffs' claims.

    A claim for negligent supervision provides a remedy for
injuries to third parties who would otherwise be foreclosed from
recovery under the principal-agent doctrine of respondeat
superior because the wrongful acts of employees in these cases
are likely to be outside the scope of employment or not in
furtherance of the principal's business.  Heller v. Patwil Homes,
Inc., 713 A.2d 105, 107 (Pa. Super. Ct. 1998); see also IRPC,
Inc. v. Hudson United Bancorp., No. 0474, 2002 WL 372945, at *4
(Pa. Com. Pl. Jan. 18, 2002) (noting that an employee acting

outside the scope of his employment is an element of a claim for negligent supervision).

In the present case, the plaintiffs have alleged throughout their complaints that the Sales Group members were acting under the direction of the Insurance Company Group and Attorney Group to further the allegedly fraudulent scheme. (Stein ¶¶ 14-16, 250; Gilmour ¶ 194; Trimble ¶ 167; Treitz ¶ 190).  Nowhere in the complaints do the plaintiffs allege that the Sales Group members were acting outside the scope of their agency.  The Court will accordingly dismiss the plaintiffs' claims against the Insurance Company Group defendants, Weinstein, and Plaza for negligent supervision.

4.   Unjust Enrichment

To state a claim for unjust enrichment, a plaintiff must allege (i) that the plaintiff conferred a benefit on the defendant, (ii) that the defendant appreciated the benefit, and (iii) that the defendant accepted and retained the benefit under circumstances such that it would be inequitable for defendant to retain the benefit without payment of value.  Mitchell v. Moore, 729 A.2d 1200, 1202 (Pa. Super. 1999).  A claim for unjust enrichment is defeated by the existence of an enforceable and binding contract.  Schott v. Westinghouse Elec. Corp., 259 A.2d 443, 448 (Pa. 1969); see also Matter of Penn Ctr. Transp. Co., 831 F.2d 1221, 1230 (3d Cir. 1987) (finding that a plaintiff

cannot maintain a claim of unjust enrichment when an express contract existed on the same subject).  A plaintiff may, however, plead in the alternative when the validity of a contract is in question.  See Indep. Enter. Inc. v. Pittsburgh Water & Sewer Auth., 103 F.3d 1165, 1175 (3d Cir. 1997).

The Insurance Company Group defendants and the EPAC defendants (EPAC, Larson, Mr. Strope, and Krygowski) argue that the plaintiffs' claims against them for unjust enrichment should be dismissed because the parties' relationships are governed by the annuity contracts.  The plaintiffs in the Stein class action complaint respond by arguing that their claims for unjust enrichment should not be dismissed because the annuity contracts were procured by fraud and may therefore be invalid.  This argument is consistent with these plaintiffs' prayer for relief, which seeks a return of all amounts paid for the defendants' products.  (Stein ¶ 300b).  Because these plaintiffs challenge the enforceability of the annuity contracts, the Court will not dismiss their claim for unjust enrichment at this time.

The plaintiffs in the Gilmour, Brennan, and Treitz individual actions argue that their claims for unjust enrichment should not be dismissed because the claims are pled in the alternative to their breach of contract claims.[17]  These

---

[17]    In contrast to the Stein plaintiffs, the plaintiffs in Gilmour, Trimble, and Treitz do not contest the validity of the annuity contracts.

plaintiffs' breach of contract claims arise from an alleged
promise made by members of the Sales Group, on behalf of the
Insurance Company Group defendants, to provide these plaintiffs
with estate planning services.  As will be discussed more fully
below, these plaintiffs have failed to state a claim for breach
of contract.  The <u>Gilmour</u>, <u>Trimble</u>, and <u>Treitz</u> plaintiffs,
however, have failed to plead that they conferred any benefit on
the Insurance Company Group or EPAC defendants in exchange for
this promise to provide estate planning services.  Indeed, the
only benefits that these plaintiffs allegedly conferred on the
insurance companies and salespeople were payments made in
connection with the plaintiffs' purchases of annuities.  The
plaintiffs' relationship with these defendants is therefore
governed by the annuity contracts.  The Court will accordingly
dismiss the <u>Gilmour</u>, <u>Trimble</u>, and <u>Treitz</u> plaintiffs' claims for
unjust enrichment against the Insurance Company Group and EPAC
defendants.

        Weinstein and Plaza argue that the claims against them
for unjust enrichment should be dismissed because the plaintiffs
have failed to plead that the attorneys conferred a benefit on
them.  The plaintiffs respond by pointing to their allegations
that these attorneys acted in concert with, and shared fees with,
attorney Bohmueller, who received money from the plaintiffs in
connection with their purchase of living trusts.  (<u>Trimble</u> ¶¶ 29-
32; <u>Treitz</u> ¶¶ 31-36).  The Court finds that this allegation is

sufficient to demonstrate that the plaintiffs conferred a benefit on Weinstein and Plaza.  The Court will accordingly deny these defendants' motion on this ground.

     5.   Fraudulent Misrepresentation and Negligent Misrepresentation

The Insurance Company Group defendants, EPAC defendants (EPAC, Larson, Mr. Strope, and Krygowski), Weinstein, and Plaza argue that the plaintiffs' claims against them for fraudulent and negligent misrepresentation should be dismissed because the plaintiffs (i) have failed to plead justifiable reliance on the alleged misrepresentations, and (ii) have failed to plead these claims with the particularity required by Rule 9(b).

To state a claim for either fraudulent or negligent misrepresentation, a plaintiff must plead justifiable reliance. See Bortz v. Noon, 729 A.2d 555, 560-61 (Pa. 1999) (listing the essential elements of both fraudulent and negligent misrepresentation).  To be justifiable, reliance upon the representation of another must be reasonable.  Porreco v. Porreco, 811 A.2d 566, 571 (Pa. 2002).  This "reasonableness" may be affected by the nature of the relationship between the parties.

Claims for fraudulent misrepresentation must meet the heightened pleading standard set forth in Federal Rule 9(b). Although Rule 9(b) does not govern claims of negligent misrepresentation, district courts in this circuit have generally

79

required "a degree of specificity."  See, e.g., Floyd v. Brown &
Williamson Tobacco Corp., 159 F. Supp. 2d 823, 834 (E.D. Pa.
2001); see also S. Ocean Seafood Co. v. Holt Cargo Sys., Inc.,
No. 96-5217, 1997 WL 539763, at *11 n.23 (E.D. Pa. Aug. 11,
1997).  The United States Court of Appeals for the Third Circuit
has cautioned that in applying Rule 9(b) pleading requirements,
courts should be sensitive to the fact that an overly stringent
application of the Rule "may permit sophisticated defrauders to
successfully conceal the details of their fraud."  See Shapiro v.
UJB Fin. Corp., 964 F.2d 272, 284 (3d Cir. 1992).

        Pennsylvania has adopted the Restatement (Second) of
Agency regarding the liability of a principal for the tortious
misrepresentations of his agents.  Bolus v. United Penn Bank, 525
A.2d 1215, 1223-24 (Pa. Super. Ct. 1987).  Under the Restatement,
"[a] principal is subject to liability for loss caused to another
by the other's reliance upon a tortious representation of a
servant or other agent, if the representation is: (a) authorized;
(b) apparently authorized; or (c) within the power of the agent
to make for the principal."  Id. (quoting the Restatement
(Second) of Agency § 257 (1958)).

        In the present case, the Court has already concluded
that the plaintiffs in the individual actions state a claim under
RICO.  This conclusion applies equally to the Rule 9(b) argument
here.  As to justifiable reliance, the plaintiffs adequately
allege such reliance, that is usually a jury question.

### 6.   Civil Conspiracy

The plaintiffs in the individual actions have alleged civil conspiracy.  The Insurance Company Group defendants and Weinstein and Plaza have moved to dismiss.  The Court will deny the motions.

In order to state a claim for conspiracy under Pennsylvania law, a plaintiff must allege: "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage."  McKeeman v. Corestates Bank, N.A., 751 A.2d 655, 660 (Pa. Super. Ct. 2000) (citations omitted).

As set out above in the section addressing the adequacy of the RICO allegations, the complaint contains sufficient allegations to fulfill the three essential elements of a conspiracy claim.

### 7.   Professional Negligence

The attorney defendants argue that the plaintiffs' professional negligence claims against them in the individual actions should be dismissed because the attorney defendants never entered into any professional relationship with the plaintiffs. The plaintiffs respond that the attorney defendants directly performed estate planning services for the plaintiffs.

81

Under Pennsylvania law, clients may bring tort actions against professionals who do not provide the client with services consistent with the standard expected of the profession. Professional negligence actions can be maintained only against persons licensed in Pennsylvania or another state as: (1) health care providers are defined in 40 Pa. Cons. Stat. § 1303.503; (2) accountants; (3) architects; (4) chiropractors; (5) dentists; (6) engineers or land surveyors; (7) nurses; (8) optometrists; (9) pharmacists; (10) physical therapists; (11) psychologists; (12) veterinarians; or (13) attorneys. Pa. R. Civ. P. 1042.1. The elements of a professional negligence claim against an attorney are: 1) employment of the attorney or other basis for duty; 2) the failure of the attorney to exercise ordinary skill and knowledge; and 3) that such failure proximately caused damage to the plaintiff. Kituskie v. Corbman, 714 A.2d 1027, 1030 (1998).

Here, the plaintiffs allege that the attorney defendants provided them with legal advice and owed them common law duties to provide competent, knowledgeable legal representation. (Gilmour ¶¶ 262-63; Trimble ¶¶ 233-34; Treitz ¶¶ 245-46). The plaintiffs claim that attorney defendants breached those duties by failing to consult with plaintiffs, failing to adequately review investment vehicles, and failing to disclose the relationships between the attorney defendants and the other defendants, among other allegations. (Gilmour ¶ 265; Trimble ¶ 236; Treitz ¶ 248). The plaintiffs claim that they suffered

82

damages due to the professional negligence of the attorney
defendants.  The Court finds that these allegations are
sufficient to plead professional negligence against the attorney
defendants.

Defendant Weinstein claims that plaintiff Trimble has
filed a defective certificate of merit and that his claims should
be dismissed on that ground.  Pennsylvania Rule of Civil
Procedure 1042.3 requires the filing of a certificate of merit
"[i]n any action based upon an allegation that a licensed
professional deviated from an accepted professional standard."
Pa. R. Civ. P. 1042.3(a).  A separate certificate of merit must
be filed against each defendant.  Pa. R. Civ. P. 1042.3(b).
Plaintiff Trimble grouped defendant Weinstein and the Weinstein
Law Offices together with "John Does 1-10 (Bohmueller Partners)."
The Court is satisfied with the validity of the certificate of
merit.  The Court considers Weinstein and the "Weinstein Law
Offices" to be the same entity.  The addition of the John Does
does not invalidate the certificate.

In addition, plaintiff Trimble alleges a second count
of professional negligence against all defendants.  The
allegations are duplicative as to the attorney defendants.  The
other defendants (the Insurance Company Group defendants, the
Patriot Group, and Spangler) are not licensed professionals under
Pa. R. Civ. P. 1042.1, and therefore the professional negligence
claim cannot be maintained.  Gilmour v. Bohmueller, No. Civ. A.

83

04-2535, 2005 WL 241181 (E.D. Pa. Jan. 27, 2005).  The Court dismisses this claim.

        8.   <u>Breach of Contract</u>

        The plaintiffs in the individual cases allege that they entered into an agreement with the defendants whereby the plaintiffs specifically instructed the defendants to provide estate planning that would result in tax and estate benefits, tax-free and otherwise beneficial investments, and living trusts that would avoid probate.  (<u>Gilmour</u> ¶ 273; <u>Trimble</u> ¶ 240; <u>Trietz</u> ¶ 270).  The plaintiffs allege that the defendants breached those agreements by failing to deliver the agreed-upon services and that the plaintiffs suffered damages as a result.  The Insurance Company Group defendants, attorney defendants Weinstein and Plaza, and the Patriot Group (as to Plaintiff Gilmour) move for dismissal.  They contend that there is no such contract and that the plaintiffs' allegations are too vague to constitute essential terms.

        Under Pennsylvania law, a claim for breach of contract must allege the following three elements: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages."  <u>Omicron Sys., Inc. V. Weiner</u>, 860 A.2d 554, 564 (Pa. Super. Ct. 2004) (citation omitted).  An enforceable contract exists where the parties reached a mutual agreement, exchanged consideration, and

84

set forth the terms of their bargain with sufficient clarity.
See Biddle v. Johnsonbaugh, 664 A.2d 159, 163 (Pa. Super. Ct. 1995) (citation omitted).

The Trimble and Treitz complaints fail to state the specific identities of the defendants who entered into the contracts.[18]  Gilmour does allege that the Sales Agent Group defendants acted as contracting agents for Bohmueller and the Insurance Group Company defendants, but all the plaintiffs fail to specify what consideration supported the contract and what the plaintiffs' duties were under the contract.  The plaintiffs' allegations restate the basic wrongs laid out in the rest of the complaints but do not specifically plead the contract's essential terms, as required in CoreStates, 723 A.2d at 1058.  This is insufficient to establish the existence of the contract.

Therefore, the plaintiffs' breach of contract claims are insufficient to establish a cause of action against any of the defendants, and the defendants' motions to dismiss these claims are granted.

---

[18]   In his reply brief Plaintiff Trimble names Mr. Strope as the agent for Weinstein and Spangler as the agent for the Insurance Group defendants.  This information does not appear in Trimble's amended complaint, however, and the Court will not take notice of it.

9.    Violation of the Pennsylvania Unfair Trade
Practices and Consumer Protection Law

The plaintiffs claim that all of the defendants
violated the Pennsylvania Unfair Trade Practices and Consumer
Protection Law ("UTPCPL" or "Consumer Protection Law") in
performing estate, asset, and tax services for the plaintiffs in
a deceptive manner likely to cause consumer confusion.  (Gilmour,
¶¶ 285-90; Trimble, ¶¶ 251-56; Treitz, ¶¶ 276-81); 73 Pa. Cons.
Stat. § 201-2(4).  The plaintiffs also allege that the Sales
Group engaged in the unauthorized practice of law, in violation
of 42 Pa. Cons. Stat. Ann. § 2524 and the UTPCPL, and that the
Insurance Company Group and Attorney Group aided and abetted the
Sales Group in this unauthorized practice of law.  (Gilmour, ¶¶
291-92; Trimble, ¶¶ 257-58; Treitz, ¶¶ 282-83).

The defendants argue that to state a claim under the
UTPCPL, the plaintiffs must plead and prove the elements of
common law fraud.  The cases the defendants cite rest on
Pennsylvania case law that predated a 1996 amendment to the
UTPCPL, changing "any other fraudulent conduct" to "any other
fraudulent or deceptive conduct."  73 Pa. Cons. Stat. § 201-2.
Since that amendment, the Pennsylvania Supreme Court has not
ruled on whether plaintiffs must still plead and prove all the
elements of common law fraud.  The Court, however, need not rule
at this point in the proceedings on the exact requirements for
stating a claim under the UTPCPL.  The Court concluded above that

the complaints state a claim for fraudulent misrepresentation and civil conspiracy.  The plaintiffs' main theory for violation of the UTPCPL is similar to conspiracy and fraudulent misrepresentation.  The Court also will not dismiss the UTPCPL claims for lack of a pleading of reliance.  Although not fulsome, the plaintiffs' pleadings sufficiently allege reliance.

Because the Court found that the complaints state a claim for violation of the UTPCPL under one of the plaintiffs' theories, the Court will not at this time rule on the validity of the plaintiffs' other theories for UTPCPL liability.

### 10.  Negligence Per Se

The plaintiffs claim that the defendants' use of non-attorney sales agents to solicit the plaintiffs to purchase living trusts and deferred annuities constitutes the unauthorized practice of law, in violation of Pennsylvania law.  They further allege that such violation gives rise to a claim of negligence per se.  The Insurance Company Group defendants and defendants Weinstein and Plaza argue that the negligence per se claim has not been adequately asserted.  The Court considers negligence per se to be a method of proving certain elements of a negligence claim (i.e., duty and breach of the duty) rather than a distinct cause of action.  The plaintiffs have not made a negligence claim, so negligence per se is inapplicable.  The Court therefore

dismisses the plaintiffs' negligence per se claims against all defendants.

11.  <u>An Accounting</u>

The plaintiffs in the individual actions have alleged causes of action for an accounting.  The Insurance Company Group defendants and Weinstein and Plaza have moved to dismiss on the ground that an accounting is not a cause of action, but a remedy. The Court agrees and will dismiss the accounting count in the three complaints.  The Court expresses no view as to whether some or all of the information sought in the accounting count would be available through discovery or whether some form of an accounting would be an appropriate remedy in this case if the plaintiffs are able to establish liability.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
IN RE: AMERICAN INVESTORS        :
LIFE INSURANCE CO. ANNUITY       :    MDL DOCKET NO. 1712
MARKETING AND SALES PRACTICES    :
LITIGATION                       :
                                 :
                                 :
Relates to:                      :
                                 :
GILMOUR v. BOHMUELLER, et al.    :
CIVIL ACTION NO. 04-2535         :
                                 :
TRIMBLE v. WEINSTEIN, et al.     :
CIVIL ACTION NO. 05-2101         :
                                 :
BRENNAN v. WEINSTEIN, et al.     :
CIVIL ACTION NO. 05-3588         :
```

ORDER

AND NOW, this 29th day of August, 2007, upon

consideration of the following motions:

A.    Motion to Dismiss Amended Complaints in
      Trimble and Brennan Actions filed by
      defendants Brett Weinstein, Esquire, and
      Jason A. Plaza, Esquire **(Docket No. 108 in
      MDL-1712; Docket No. 63 in Civil Action No.
      05-2101);**

B.    Motion to Dismiss Fourth Amended Complaint
      filed by Plaintiff Gilmour of defendants
      AmerUs Group Co., AmerUs Annuity Group Co.,
      American Investors Life Insurance Company,
      Creative Marketing International Corp., and
      American Investors Sales Group Co. **(Docket
      No. 111 in MDL-1712; Docket No. 173 in Civil
      Action No. 04-2535);**

C.    Motion to Dismiss First Amended Complaint
      filed by Plaintiffs Treitz and Brennan of
      defendants AmerUs Group Co., AmerUs Annuity
      Group Co., American Investors Life Insurance
      Company, and Creative Marketing International

Corp. **(Docket No. 112 in MDL-1712; Docket No. 53 in Civil Action No. 05-3588);**

D.   Motion to Dismiss Consolidated Amended Class Complaint of defendants AmerUs Group Company, AmerUs Annuity Group Company, American Investors Life Insurance Company, Creative Marketing International Corporation, and Insurance Agency Marketing Services, Inc. **(Docket No. 113 in MDL-1712);**

E.   Motion for Judgment on the Pleadings as to Trimble's First Amended Complaint of defendants AmerUs Group Co., AmerUs Annuity Group Co., American Investors Life Insurance Company, Inc., and Creative Marketing International Corp. **(Docket No. 123 in MDL-1712; Docket No. 67 in Civil Action No. 05-2101);**

F.   Motion to Dismiss Plaintiff's Amended Complaint of defendants Brian J. Newmark, Estate Planning Advisors Corp., Victoria Larson, Diane Strope, Mary Chiavaroli, and Kenneth Krygowski **(Docket No. 133 in MDL-1712; Docket No. 56 in Civil Action No. 05-3588);**

G.   Motion to Dismiss Counts I, II and VII of the Fourth Amended Complaint filed by defendant The Patriot Group, Inc. **(Docket No. 167 in Civil Action No. 04-2535);**

H.   Motion to Dismiss Fourth Amended Complaint filed by defendant Bohmueller **(Docket No. 172 in Civil Action No. 04-2535);**

I.   Motion to Dismiss First Amended Complaint filed by defendant Bohmueller **(Docket No. 64 in Civil Action No. 05-2101);**

J.   Motion to Dismiss Amended Complaint of defendants Brett Weinstein, Esquire, and Jason A. Plaza, Esquire **(Docket No. 51 in Civil Action No. 05-3588);** and

2

K.   Motion to Dismiss First Amended Complaint
     filed by defendant Bohmueller **(Docket No. 52
     in Civil Action No. 05-3588);**

and upon consideration of the oppositions to the motions and

after oral argument held on March 30, 2007, IT IS HEREBY ORDERED

that said motions are granted in part and denied in part for the

reasons stated in a memorandum of today's date as follows:

1.   The motions of AmerUs Group
Company, Brian Newmark, Mary Chiavaroli, and Diane
Strope are granted in their entirety.

2.   The motions of AmerUs Annuity Group
Co., American Investors Life Insurance Co.,
American Investors Sales Group, Creative Marketing
International Corporation, and Insurance Agency
Marketing Services, Inc., are granted as to the
RICO claims of Jean Ryles, George Miller, Edward
and Gloria Inferrera, and Evelyn Edwards, and as
to the claims of negligent supervision, unjust
enrichment in the individual actions, breach of
contract, professional negligence, negligence per
se, and an accounting.  In all other respects,
their motions are denied.

3.   The motion of The Patriot Group is
granted as to the claims of breach of contract,
negligence per se, professional negligence, and an
accounting.  In all other respects, its motion is
denied.

4.   The motions of Barry Bohmueller are
granted as to negligence per se, breach of
contract, and an accounting.  In all other
respects, his motions are denied.

5.   The motions of Brett Weinstein and
Jason Plaza are granted as to negligent
supervision, breach of contract, negligence per
se, and an accounting.  In all other respects,
their motions are denied.

6.   The motion of Estate Planning
Advisors Corp., Victoria Larson, and Kenneth
Krygowski is granted as to unjust enrichment,

breach of contract, negligence per se, and an accounting. In all other respects, their motion is denied.

7. The professional negligence claim is also dismissed as to Ralph Spangler.

8. The breach of contract, negligence per se, and accounting claims are dismissed as to all the defendants.


BY THE COURT:


/s/ Mary A. McLaughlin___
MARY A. McLAUGHLIN, J.


4